September 10, 1952.

Record No. 3941.

Present, Hudgins, C. J., and Eggleston, Spratley, Buchanan, Miller and Whittle, JJ.

70

The opinion states the case.

*Ashburn, Agelasto & Sellers,* for the appellant.

*Shapero & Shapero* and *William L. Parker,* for the appellee.

EGGLESTON, J., delivered the opinion of the court.

In April, 1948, H. H. Harris, sometimes hereinafter referred to as the complainant or the plaintiff, filed a bill in equity against John Twohy, II, sometimes hereinafter referred to as the defendant, alleging in substance that from January 1, 1930, until December 28, 1946, the complainant was employed by the defendant and a number of corporations in which the defendant had a controlling interest and in which the complainant was an officer and director, namely, Commonwealth Sand & Gravel Corporation, Interstate Sand & Gravel Corporation, Aberdeen Sand Company, Inc., Transit Mixed Concrete Corporation, Ready Mixed Concrete Corporation, Angerona Corporation, Regal Realty Corporation, and Enterprise Drug Company, Inc.; that on or about March 1, 1940, the complainant told the defendant that he, the complainant, "could no longer afford to continue" such employment for the amount of the compensation which he was then receiving and that he would seek other employment; that the defendant promised the complainant, in consideration of the complainant's agreement to remain in the employ of the defendant and these corporations, that he "would make over to" the complainant ten per cent of the capital stock of each of these corporations, and that if in the future the employment of the complainant with the defendant and these corporations should be terminated, he, the defendant, would then "pay to the complainant in cash the book value of said ten per cent of the capital stock of said corporations, or the appraised value thereof, whichever might be higher;" that relying upon this promise of the defendant, the complainant remained "in the employ of the defendant and * * * as officer and director of the corporations," and continued to perform the services for them until December 28, 1946, when he, the complainant, was "summarily dismissed as of January 1, 1947," by the defendant, and "requested to terminate his employment by resignation;" that the defendant "has not had transferred to the name of your complainant any stock in any of the corporations * * *, nor has he paid to your complainant either the book value of such ten per cent of such stock or the appraised value thereof;" and "that the defendant ought in equity and good conscience be compelled to perform his promise hereinabove set out and to pay to your complainant either the book value or ap-

praised value of ten per cent of the outstanding capital stock of all of said corporations mentioned above, whichever may be the higher."

The prayer of the bill was that the contract between the complainant and the defendant be specifically enforced; "that the defendant be compelled to pay to your complainant the book value or the appraised value, whichever may be the highest (*sic*), of ten per cent of the outstanding stock" of the named corporation; "that the defendant be compelled to give an accounting to your complainant disclosing the amount of the capital stock in each one of said corporations * * *, the book value thereof per share, and the appraised value thereof per share;" and that the complainant be awarded "such other and further relief, both general and special, as the nature of his case" might require.

The defendant filed a special plea of the statute of limitations and an answer, the latter denying that he had entered into the contract alleged in the bill, or that he was indebted to the complainant or obligated to him "in any form whatsoever in money or stock or otherwise."

Over the objection of the defendant the complainant was permitted to file an amended bill of complaint in which the allegation in the original bill that the defendant agreed to "make over to" the complainant ten per cent of the capital stock of each of the corporations was changed to read that the defendant agreed to "hold for the benefit of the complainant" the same percentage of the stock of each of the corporations.

To the amended bill the defendant pleaded the statute of limitations and denied by answer the making of the promise or undertaking alleged.

After issue had been joined the lower court on its own motion and without objection by either party entered a decree directing an issue out of chancery for a jury trial to ascertain and decide the following questions:

"Whether or not the defendant on or about the first day of March, 1940, promised the plaintiff, in consideration of plaintiff's agreement to remain in the employ of the defendant and of" the named corporations, "that defendant would hold for the benefit of the plaintiff ten per cent of the capital stock of each of said corporations in which plaintiff was an officer and director, by which he was employed, and for which he had been and was

performing services; that, if in the future the employment of the plaintiff with the defendant and said corporations should be ended, he, the defendant, would pay to the plaintiff in cash the book value of ten per cent of the capital stock of all of said corporations or the appraised value thereof, whichever might be higher.''

The decree further directed that in the trial of the issues the plaintiff should maintain the affirmative and the defendant the negative.

On the issue submitted the jury found for the complainant. The trial court overruled the motion to reject the verdict and decreed that the defendant present an accounting of the book value and appraised value of ten per cent of the capital stock of the several corporations as of January 1, 1947.

Subsequently the parties agreed on the total of $25,272.10 as the higher of the book or appraised value of such stock. Accordingly, it was decreed that the complainant, Harris, should recover of the defendant, Twohy, that amount with interest from January 1, 1947, until paid. From that decree the defendant, Twohy, has appealed.

Before considering the merits of the controversy we shall dispose of the two procedural questions raised by the assignments of error.

The first contention is that the lower court erred in allowing the filing of the amended bill because, it is said, it ''changed complainant's theory of his case'' for the purpose of avoiding the plea of the statute of limitations which had been filed to the original bill.

As has been said, the original bill alleged that the defendant had promised, in consideration of the complainant's remaining in the employ of the defendant and the named corporations, that he ''would make over to'' the complainant ten per cent of the capital stock of each of the corporations. In the amended bill the allegation was that the defendant agreed that he ''would hold for the benefit of the complainant'' ten per cent of the capital stock of each of the corporations.

The amended bill contained the identical allegation found in the original bill, that the defendant further agreed that if the complainant would remain in the employ of the defendant and continue to perform the services for him and for the corporations

the defendant would upon the termination of the employment "pay to the complainant in cash the book value of said ten per cent of the capital stock of said corporations, or the appraised value thereof, whichever might be higher."

The amended bill also contained the same allegations found in the original bill as to the performance of the agreement on the part of the complainant and the breach thereof by the defendant, in that he had not paid the complainant "either the book value of such ten per cent of such stock or the appraised value thereof."

The prayer of the amended bill was the same as that in the original bill, "that the said contract between your complainant and the defendant may be specifically enforced and that the defendant be compelled to pay to your complainant the book value or the appraised value, whichever may be the highest (sic), of ten per cent of the outstanding stock" of the named corporations.

It will be observed that the promise sued on is not the obligation of the defendant to "make over to" the complainant the stock as alleged in the original bill, or to "hold for the benefit of the complainant" the stock as alleged in the amended bill. The promise sued on is the obligation of the defendant to pay to the complainant in cash "the book value of said ten per cent of the capital stock of said corporations, or the appraised value thereof, whichever might be higher," upon the termination of complainant's employment by the defendant and the corporations which the defendant controlled.

The decree appealed from constitutes a money judgment in favor of the complainant against the defendant for the value of the stock. There is no decree in favor of the complainant against the defendant for any stock in any of the corporations or any interest therein.

The obligation of the defendant that he would "make over to" or "hold for the benefit of" the complainant certain stock in the corporations was merely collateral to his promise to pay the complainant the value of the stock. Thus, we think, there is no substance to the contention of the defendant that the allegations of the amended bill "changed the complainant's theory of his case," and permission to file it was clearly within the discretion of the trial court.

Complaint is next made of the action of the court in directing an issue out of chancery on its own motion. The argument

is that no foundation was laid and no showing made by affidavits or otherwise that the case would be "rendered doubtful by the conflicting evidence" of the parties as contemplated by Code, § 8-214, before the issue out of chancery was ordered.

The trouble with this position of the defendant is that he made no objection to the action of the lower court in directing the issue out of chancery. Neither party objected to the entry of the order and apparently both complainant and defendant were ready and willing to leave the determination of the issue of fact to the jury. Neither at the time of the entry of the order nor after the verdict did the defendant raise any question as to the propriety of the court's action. Under such circumstances the objection for the first time in the appellate court to such action by the trial court comes too late and will not be considered by us. See Rule 1:8.

Where the parties have thus, in effect, agreed to the direction of an issue out of chancery by the court on its own motion, the effect of the verdict on appeal is the same as it would have been had the issue been directed at the instance of one of the parties upon a showing of the necessity therefor.

The settled practice in this State is that when a question of fact is referred to a jury in an issue out of chancery, depending upon conflicting testimony, the verdict approved by the trial court will be affirmed on appeal unless it is palpably and obviously erroneous or without evidence to support it. *Barbour* v. *Melendy,* 88 Va. 595, 598, 599, 14 S. E. 326; *Norfolk, etc., R. Co.* v. *Allen & Sons,* 122 Va. 603, 609, 95 S. E. 406; *Stuart* v. *Smith-Courtney Co.,* 123 Va. 231, 238, 239, 96 S. E. 241.

In the light of the verdict the evidence may be thus summarized: Since 1928 Twohy has been engaged in the business of producing and marketing sand and gravel and ready-mixed concrete, with his principal office in the city of Norfolk where he resides. This business was conducted through a number of corporations, all of which, however, were not active at the same time. These were: Commonwealth Sand & Gravel Corporation, Interstate Sand & Gravel Corporation, Aberdeen Sand Company, Inc., Transit Mixed Concrete Corporation, and Ready Mixed Concrete Corporation. While the capital stock of all of these corporations was not registered in Twohy's name, it is clear from the evidence that he was the real owner of and con-

trolled such stock, and was the directing head of each corporation.

In 1929 the Commonwealth Sand & Gravel Corporation leased the property of Massaponax Sand & Gravel Corporation, which was engaged in a similar business at Fredericksburg, and took over certain of its employees including the complainant, Harris. In 1930 Harris, upon the instruction of Twohy, moved to Norfolk where he entered the employ of Twohy and the affiliated corporations. Harris became an officer and director of each of the corporations named above. According to his testimony and, that of his supporting witnesses, he was in charge of the Norfolk office in which these various enterprises were then conducted, supervising the sales, purchasing materials and supplies, hiring the employees, and attending to the banking and financial details.

Harris likewise became an officer and director in and performed services for these other corporations owned and controlled by Twohy: Regal Realty Corporation, which was chartered and organized for the purpose of holding title to the Twohy residence and the lots adjacent thereto in the city of Norfolk; Angerona Corporation, organized to hold title to certain corporate securities; and Enterprise Drug Company, Inc., a corporation formed to operate a drugstore in which Twohy's nephew was interested, but from which young Twohy later withdrew and the stock came under the ownership or control of the defendant.

In March, 1940, Harris decided that his opportunities for further advancement with the Twohy interests were limited and that the salary of approximately $4,500 which he was then receiving was inadequate to provide for the needs of his family and his future. He communicated these conclusions to Twohy and announced his determination to seek employment elsewhere, with the result that Twohy, as an inducement to Harris to continue in his employ, made the promise which is the subject matter of this suit. Harris' account of what transpired between Twohy and himself in this connection is this:

"Well, Mr. Twohy was in my office and we were discussing things generally, and I told him, 'Now, I have been with you and these companies ten years. I am worse off financially than I was when I came, and unless there is some provision made for my future I will be forced to see what I can do somewhere else.'

He said, 'Oh, you cannot do that, nobody can do these jobs like you are doing. I will tell you what I will do. I will set aside 10% of the stock of all these companies you are working for and if and when you leave the services of the company I will pay you at that time 10% of the cash value based on the book value or appraised value, whichever is the higher,' and he says, 'Now, you call in Mr. Jolliff, the bookkeeper, and have him witness this.' "

J. L. Jolliff, a disinterested witness, who voluntarily left Twohy's employ in 1946, and who now holds a responsible position with the treasurer of the city of Portsmouth, fully corroborated Harris' testimony as to this incident.

Relying upon this agreement, Harris said, he remained in the employ of Twohy and his associated companies until his discharge on December 28, 1946.

At the time that this agreement was entered into, in March, 1940, the business of the Twohy corporations then in operation was none too prosperous, but with the commencement of construction work incidental to defense preparations in the Norfolk area just prior to World War II, the business took on a different complexion and entered into a period of prosperity which continued at least through the year 1945. The active Twohy corporations were able to borrow substantial sums, as much as $400,000 in 1942, from the Federal Reserve Bank of Richmond. With the expansion in business Harris' responsibilities increased. According to his testimony, Harris fully measured up to such responsibility and properly performed his duties without criticism or reprimand from Twohy.

On December 28, 1946, while Harris was visiting his daughter in New York, Twohy sent him a letter by registered mail at his (Harris') residence address at Norfolk, summarily discharging him as of that date. The reason for Harris' discharge was thus stated in that letter: "I have attempted to afford you every opportunity to grow in statute (*sic*) with these corporations but to no avail. I have had to employ other people to properly do the work you should have seen the need for and attended to without any prompting on my part, and in view of your evident lack of interest in the general progress of the companies I do not feel that it is fair to these other employees of the several corporations, either here or elsewhere, or to myself to continue

to carry you further. Therefore, you need not report for duty after this date.''

The letter, which was signed ''Commonwealth Sand & Gravel Corporation and Associate Companies, John Twohy, II, President,'' further informed Harris that he was to terminate his employment ''by resignation.'' ''In consideration of the length of time'' which he had been employed, the letter continued, Harris would be paid one-half of his then yearly salary of $5,500 in weekly installments extending over a period of six months.

In compliance with this letter Harris tendered his resignation as officer and director in each of the corporations. He accepted the weekly checks which were sent him throughout the six months period, as indicated in the letter. During this time Harris made no claim that Twohy was indebted to him in any further amount by virtue of the alleged statement which is the basis of this suit. His failure to make such demand, he testified, was upon the advice of counsel whom he had employed in the meantime.

Twohy denied categorically that he had entered into the agreement with Harris as testified to by the latter and corroborated by Jolliff. He denied that he had ever had any conversation with Harris on the subject.

According to Twohy, during the entire time of Harris' employment he was entrusted with no great responsibilities, his status was merely that of a clerk in the office, and as the business of the affiliated corporations increased the responsibilities were handled by Twohy and others. Indeed, Twohy testified, such work as was assigned to Harris was done none too well and was frequently the subject of criticism by his employer.

The defendant relies heavily upon the testimony of Collins Denny, Esquire, a member of the Richmond Bar, who was counsel for the Twohy interests in 1941. In August of that year Twohy suffered a severe illness from which some of his associates feared that he might not recover. Denny testified that he came to Norfolk to inform himself as to the condition of the operating corporations in which Twohy was interested. He said that he asked Harris whether ''he knew of any interest any person had or any kind of agreement in any stock'' of these corporations except as might be disclosed by the stock ledgers. Harris

replied that he knew of no such interest other than that certain stock stood in Denny's name, and that Major Thom, who held a responsible position with some of the corporations, might have an agreement with Twohy with respect to a stock interest.

Harris flatly denied that he made such a statement to Denny, and the verdict, accepted by the trial court, settled this issue of fact.

Thus it will be observed that whether the agreement which is the basis of this suit was entered into between the parties was a pure question of fact and peculiarly within the province of the jury to decide. Harris' testimony as to the making of the contract is clear and specific and is corroborated by that of Jolliff. Twohy's denial of the making or existence of the contract is equally as emphatic.

There are circumstances, some of which have been related, which support the position of each of the opposing parties. On behalf of Twohy it is argued that it is unlikely that such an important contract would have been entered into so loosely and without a written memorandum thereof. While there is force to the argument, the fact that the parties did not reduce the agreement to writing was but a circumstance to be weighed by the jury in determining whether the agreement was entered into. The absence of a written memorandum does not, of course, make Harris' testimony as to the verbal contract, corroborated by Jolliff, incredible.

But not all of the incidents which occurred during the trial could be interpreted as favorable to Twohy's position. Shortly after he had taken the stand Twohy was asked a question by his counsel concerning the stock ownership of one of the corporations here involved. His reply was, "I would have to refer to the books. I have got a notoriously poor memory." While the matter then under discussion was not crucial, such a gratuitous statement was not, to say the least, calculated to inspire the confidence of the jury in the defendant's recollection of matters which were vital to his case.

Such incidents, as well as others relied on by the defendant, merely go to the credibility of the witnesses upon whose testimony the case depends.

We are of opinion that there is ample evidence to support the verdict of the jury which has been accepted by the trial court.

The defendant argues that this is a suit for specific performance of an express parol trust,—that is, the agreement of Twohy to hold certain stock for the benefit of Harris,— and that neither the intention to create such a trust nor the identity of the subject matter is established by "clear and unequivocal" or "clear, cogent and convincing" evidence, as is required in such cases. *Russell* v. *Passmore,* 127 Va. 475, 496, 103 S. E. 652; *Massie* v. *Parrish,* 140 Va. 717, 727, 125 S. E. 691.

But such is not the nature of the present suit. As has been said, its purpose is not to establish a claim to specific stock, but to recover on the defendant's agreement to pay the complainant the value of the stock upon the termination of his employment.

Nor was the case tried below upon the theory now advanced by the defendant. When the issue as to whether the contract had been entered into was submitted to the jury they were properly told in instructions offered by both parties that the burden was on the complainant to prove "by a preponderance of the evidence" that such an agreement had been entered into.

The defendant next insists that the contract sought to be enforced, as outlined in the complainant's own testimony, lacks the definiteness and consideration essential to a valid agreement. It is argued that the contract fails to define for whom Harris was to work, what work he was to do, how long he was to perform it, and for what salary. Moreover, it is said, the agreement binds Harris to do nothing and is lacking in mutuality.

When the contract is construed in the light of the circumstances it is sufficiently definite and certain to be enforced. In substance, the claim of Harris is that Twohy offered him additional compensation, measured by the value of certain stock controlled by Twohy, if he (Harris) would refrain from severing the business relations between the parties and continue the services he was then performing.

The necessary implication is that Harris was to continue such services as long as Twohy should require him to perform them, or, to put the matter another way, until Harris gave Twohy just cause to end the employment. In *Norfolk Southern R. Co.* v. *Harris,* 190 Va. 966, 976, 977, 59 S. E. (2d) 110, 114, 115, we held that employment on such a basis was for a definite length of time.

A further implication from the offer, viewed in the light of the circumstances, is that Harris was to receive the same salary, or such other as the parties might agree upon.

According to Harris, he accepted Twohy's offer, refrained from exercising his right to quit the employment, and fully performed the required services for a period of nearly seven years. This was a complete acceptance of the offer and constituted a valid and enforceable contract between the parties.

■ It is well settled that a contract made under such circumstances is supported by a valid consideration. The principle is thus stated in Williston on Contracts, Rev. Ed., Vol. 1, § 130-B, p. 452: "* * * if the purpose and effect of the executory promise of a bonus is to induce the employee to refrain from exercising his liberty of quitting and, in reliance thereon, he does so refrain, for the period specified, there is sufficient consideration to render the contract enforceable." For a full discussion of the subject see *Hercules Powder Co.* v. *Brookfield*, 189 Va. 531, 541, 542, 53 S. E. (2d) 804, 808, 809; *Norfolk Southern R. Co.* v. *Harris, supra;* Annotation, 28 A. L. R. 331.

■ In such case the doctrine of mutuality is inapplicable. As is said in 12 Am. Jur., Contracts, § 14, p. 512, "* * * where one makes a promise conditioned upon the doing of an act by another, and the latter does the act, the contract is not void for want of mutuality, and the promisor is liable though the promisee did not at the time of the promise engage to do the act; for upon the performance of the condition by the promisee, the contract becomes clothed with a valid consideration which renders the promise obligatory." See also, *Norfolk Southern R. Co.* v. *Harris, supra* (190 Va., at page 976, 59 S. E. (2d), at page 115).

■ It is unnecessary that we review in detail the assignments of error as to the rulings of the trial court on the admission and exclusion of certain evidence. We have repeatedly held that a review of the trial court's action upon a motion for a new trial, in an issue out of chancery, is governed by somewhat different rules from those obtaining in an action at law, and that although "evidence may have been improperly admitted or excluded, the decree will not be reversed and a new trial granted upon the issue if the verdict appears to be right upon a consideration of all the evidence, including that which was

rejected.'' *Richardson* v. *Breeding,* 167 Va. 30, 35, 187 S. E. 454, 456, and cases there collected.

We are satisfied that none of the rulings complained of was prejudicial to the rights of the defendant or improperly influenced the verdict complained of.

We are of opinion that there is ample evidence to support the verdict of the jury which saw and heard the witnesses, and the action of the trial court which after like opportunity approved the verdict. We find no error in the proceeding and the decree appealed from is

*Affirmed.*