## ATLANTIC AND DANVILLE RAILWAY COMPANY, ET AL. v. H. LESTER HOOKER, W. MARSHALL KING, AND RALPH T. CATTERALL, COMMISSIONERS OF THE STATE CORPORATION COMMISSION, ET AL.

January 26, 1953.

Record No. 4042

Present, All the Justices.

The opinion states the case.

*Hunton, Williams, Anderson, Gay & Moore, H. Merrill Pasco, J. O. Atkinson, Thomas B. Gay, R. E. Northup, Stuart T. Saunders, H. L. Walker,* for the petitioners.

*J. Lindsay Almond, Jr., Attorney General,* and *Henry T. Wickham, Assistant Attorney General,* for the respondents.

*William M. Blackwell* and *Oscar L. Shewmake* for Virginia Highway Users Association, Incorporated, and certain other intervenor-respondents.

*David J. Mays* and *J. Randolph Tucker, Jr.,* for North Carolina Motor Carriers Association, Incorporated, and certain other intervenor-respondents.

SPRATLEY, J., delivered the opinion of the court.

We are asked to determine: (1) whether or not a declaration of the Honorable John S. Battle, Governor of Virginia, of June 25, 1952, waiving the payment of the gross receipts road tax imposed by § 58-638 Code of Virginia, 1950, on out-of-state interstate carriers of property on revenue derived from their interstate operations over the public highways of Virginia, so long as their home states "do not require Virginia interstate motor carriers of property to pay a gross receipts tax, ton-mileage tax or other similar tax on revenue derived from interstate operations," meets the requirements of §§ 46-21 and 46-22, Code of Virginia, 1950, hereinafter referred to as the Reciprocity Act; and, (2) whether if it does meet the requirements of the said Act, the Act itself contravenes § 163 of the Constitution of Virginia and the Fourteenth Amendment to the Constitution of the United States.

Section 58-638 Code of Virginia, 1950 (Acts 1948, page 1120) requires, except as therein otherwise provided, every foreign and domestic motor vehicle carrier of passengers and property for compensation to pay a two per cent road tax based on the gross receipts from its intrastate and interstate operations over the public highways of this State.

Sections 58-639 and 58-643 make certain exemptions not pertinent here. Section 58-640 requires every person subject to the tax to make reports to the State Corporation Commission, hereinafter referred to as the Commission, with respect to his operations of such motor vehicles, from time to time, as the Commission may require.

Section 46-21 creates a Reciprocity Board, hereinafter referred to as the Board, consisting of the Commissioner of Motor

Vehicles, the State Highway Commissioner, and one member of the State Corporation Commission. Section 46-22 grants to the Governor and the Board the following powers:

"§ 46-22. Governor may make reciprocal agreements.—The Governor may, with the advice of the Board, enter into reciprocal agreements on behalf of the Commonwealth with the appropriate authorities of any state in the United States, or of the District of Columbia, with respect to all taxes imposed by this State and by any such other state on motor vehicles, or on the operation of motor vehicles, or upon any transaction incident to the operation of motor vehicles.

"All agreements entered into by the Governor with respect to any subject of reciprocity as to which provision is expressly made by statute shall conform to the provisions of such statute. As to any other subject of reciprocity appropriate to the powers vested in the Governor by this section, the Governor may, with the advice of the Board, agree to such terms and conditions as in his judgment are best calculated to promote the interests of the Commonwealth. (1942, p. 591; Michie Code 1942, § 2154 (83c).)"

The prayer of the petitioners, fourteen companies authorized to conduct a rail transportation or express business in Virginia, is for a peremptory writ of mandamus directing and requiring the Commissioners of the State Corporation Commission to cause all foreign motor carriers to make the reports required by § 58-640 of the Code of Virginia, 1950, in the same manner and at the same time that such reports are required to be made by domestic motor carriers, and to assess and collect from all foreign motor carriers the taxes imposed by § 58-638.

H. Lester Hooker, W. Marshall King and Ralph T. Catterall, as members of the State Corporation Commission, in their answer, deny that they have failed to perform any ministerial duty incumbent upon them in connection with the assessment and collection of the said tax. They rely upon the unilateral declaration issued by Governor Battle on June 25, 1952.

Twenty-six interstate motor freight carriers, the Virginia Highway Users Association, Inc., and the North Carolina Motor Carriers Association, Inc., were allowed to intervene by leave of court, and several of the intervenor-respondents answered the petition for the writ of mandamus denying its sufficiency in law.

Petitioners contend that the declaration of Governor Battle

of June 25, 1952, is invalid because it does not comply with the requirements of the provisions of Code, § 46-22, in that it is not, in fact, a "reciprocal agreement" as that term is used in the statute; but is merely a unilateral declaration of policy. It is argued that the language of the Act requires that any "reciprocal agreement" entered into must express the mutual assent or understanding of Virginia with the "appropriate authorities of other states," and that since some states have no officers authorized to make "reciprocal agreements," no mutual understanding can be had with those states. Petitioners argue also that the declaration is not a "reciprocal agreement" because there is no exchange of privileges and benefits substantially the same between the states, especially where Virginia waives the tax on motor carriers of a state which has enacted no statute which would impose a comparable tax on Virginia motor carriers operating in that state.

On the other hand, respondents contend that the object of Code, § 46-22 is to secure for residents of Virginia the free movement of commerce and trade over the roads of other states in return for a similar privilege granted to non-residents of such states over Virginia roads, by inducing other states not to require the payment of taxes by residents of Virginia, either by a waiver of taxes imposed, or a forbearance of their imposition by statute, and that since the privileges to be granted are identical, true reciprocity in kind can be attained.

With the advent of motor vehicles and their rapidly increased use as carriers of persons and property, the legislature early recognized the necessity for their regulation and control. In 1910, the first revenue license statute for such vehicles was enacted, providing for their registration and the payment of a tax. Acts of 1910, chapter 326.

This Act contained several provisions relating to the imposition of licenses and taxes upon motor vehicles operated in interstate travel. It granted to non-resident owners of motor vehicles the free use of the highways of this State for two weeks in each calendar year, provided such non-residents had complied with the registration and licensing laws of the state of their residence, It authorized the Governor to enter into reciprocal agreements with other states under which the registration of motor vehicles owned by residents of this State would be recognized by such other states. It further empowered the Governor to grant to

residents of other states the privilege of using the roads of this State in return for similar privileges granted residents of this State by other states. Code of Virginia, 1919, § 2137.

The Act was amended by Acts 1920, Chapter 205, page 283, Code of Virginia, (Michie) 1930, § 2137, to read as follows:

"Exemption of non-resident owners.—The provisions of the foregoing sections relative to registration and display of registration numbers shall not apply to a motor vehicle owned by a non-resident of this State, other than a foreign corporation doing business in this State, provided that the owner thereof shall have complied with the provisions of the laws of the foreign country, State, territory or federal district of his residence relative to registration of motor vehicles and the display of registration numbers thereon, and shall conspicuously display his registration numbers as required thereby. The provisions of this section, however, shall be operative as to a motor vehicle owned by a non-resident of this State only to the extent that under the laws of the foreign country, State, territory or federal district of his residence like exemptions and privileges are granted to motor vehicles duly registered under the laws of and owned by residents of this State. (Id., § 10; 1920, p. 283.)"

Section 2137, Code of 1930, was repealed in 1932, Acts of 1932, page 884, and in lieu thereof new provisions for reciprocity were set out in detail in the Motor Vehicle Code enacted that year. Acts 1932, page 613, 626 as amended by Acts 1934, page 387. These provisions appear in Code of Virginia, 1942 (Michie), as § 2154 (70), and in the Code of 1950 as §§ 46-110, 46-111, 46-115, 46-117, 46-118, 46-120 and 46-122.

The gross receipts tax, a specific charge for the use of roads by operators of motor vehicles, was first imposed in Virginia in 1930 on common carriers of persons and property for compensation, at the rate of one and one-half per cent of the total gross transportation receipts of such carriers arising out of operations in Virginia. Acts of 1930, chapter 419. In 1932, the rate was increased to two per cent. Acts of 1932, chapter 360; and with minor amendments, the first Act remained in force until 1942. In the latter year the Act was amended and reenacted to extend to contract carriers of property for hire, effective as of January 1, 1943. Acts of 1942, chapter 377, Section 36, Code of Virginia, 1942, (Michie) § 2154 (83).

In the Act of 1942, a new section 36-c was added creating the

Reciprocity Board, hereinbefore mentioned, § 46-21 of the Code of Virginia, 1950, and conferring upon the Governor of Virginia the authority and power to enter into reciprocal agreements, § 46-22 Code of Virginia, 1950.

·The General Assembly at its 1946 session, Acts of 1946, chapter 196, decided to dispense with the gross receipts tax as to carriers of property but not as to carriers of passengers as of March 15, 1947. In lieu of the gross receipts tax on carriers of property it raised the license tax on such carriers and increased the tax on gasoline one cent per gallon. This was done by amending and reenacting the sections relating to the gross receipts tax and eliminating the provisions as to property carriers. However, the provisions of Code, §§ 46-21 and 46-22 were expressly reenacted in their present form.

In 1948, Acts 1948, chapter 550, the General Assembly reimposed the gross receipts tax on carriers of property for compensation. The tax, however, has not been collected from foreign motor carriers of property since January 1, 1943, because of oral and written declarations or agreements by the Reciprocity Board and the several succeeding Governors of Virginia waiving its collection, upon terms and conditions hereinafter referred to.

After the reenactment of 1942, which laid the tax on common carriers and contract carriers for hire, the Honorable Colgate W. Darden, Governor of Virginia, with the advice of the Reciprocity Board, entered into several formal and informal bilateral agreements with other states granting reciprocity with respect to gross receipts taxes on carriers of property. This country was then at war, and it was thought that the elimination of the tax would promote and facilitate the convenience of motor vehicular movements in interstate commerce. After the cessation of hostilities, the Board advised Governor Darden that the tax should be collected as to out-of-state carriers. Such carriers were then notified that the tax would be reinstated December 15, 1945, but the date was later extended to January 1, 1946.

Shortly after his inauguration in 1946, Governor William M. Tuck, on the recommendation of a majority of the Reciprocity Board, notified the carriers that the two per cent tax would not be imposed as to foreign motor carriers from states which did not collect a comparable tax from Virginia carriers. The tax was not collected from such carriers, although the Act of 1946

repealing the gross receipts tax as to motor carriers of property did not become effective until March 15, 1947.

After the legislature, in 1948, reenacted the provisions imposing the tax on carriers of property as of January 1, 1949, the Reciprocity Board held a series of meetings and recommended to Governor Tuck that Virginia, "in order to promote uniformity and avoid discrimination" should waive the tax without formal written agreement as "to all states and the District of Columbia on condition that they refrain from imposing on Virginia interstate carriers of freight any gross receipts or other similar tax." Governor Tuck approved the recommendation and issued the first written declaration to that effect on October 28, 1949.

The circumstances surrounding the action of the Board are indicated in the following extract from the minutes of its meeting on October 28, 1949:

"Governor Tuck explained the principles that he had adopted and followed in reference to reciprocity during his tenure of office as Governor and very emphatically stated that reciprocity should be extended wherever possible and that his thought was that where an operating agreement was in effect and satisfactory this was as good or better than an executed written agreement. Discussion was had along this line and Judge Catterall dictated a statement outlining the policy of the Governor and the Reciprocity Board, which has subsequently been executed by the Governor and the Board (copy attached). It was felt that this declaration of policy was sufficient to cover any state where a written agreement cannot be effectuated, provided, of course, that such state extends like privileges to Virginia operators."

On January 22, 1952, the Reciprocity Board recommended to Governor John S. Battle that a former declaration of Governor Wm. M. Tuck be amended so as to extend the exemption from the gross receipts tax to the vehicles of foreign carriers required to purchase license and/or registration plates in Virginia. The recommendation was as follows:

"WHEREAS, since the enactment of the gross receipts tax law on certain classes of motor carriers operating in or through Virginia, it has been the continuing policy of the Commonwealth of Virginia to enter into formal reciprocity agreements and observe informal reciprocity agreements with those states which are not allowed by statute to enter into such formal agreements

for the purpose of relieving out-of-state interstate carriers of freight from such gross receipts tax on their interstate operations, provided their home states did not impose a like or similar tax on such Virginia carriers; and

"WHEREAS, numerous reciprocity agreements to that effect have been negotiated with the various states and states which have not authorized their officials to enter into formal reciprocity agreements have refrained from imposing on Virginia interstate carriers of freight any gross receipts or other similar tax;

"NOW, THEREFORE, in order to promote uniformity and to further the free flow of commerce through Virginia and to avoid discrimination, the Reciprocity Board of the Commonwealth of Virginia advises the Governor that in its opinion the same reciprocity with respect to waiving any and all license fees and taxes be granted, with the exception of those fees provided for by Title 46, Sections 142 and 154, and the payment of taxes required under Virginia's motor fuel tax and use fuel tax. Vehicles based in Virginia, but operated by out-of-state carriers, which may be required to purchase license and/or registration plates, shall be exempt from gross receipts tax on all shipments that are moving in interstate commerce. This should be extended with or without formal written agreements to all states and the District of Columbia on condition that they refrain from imposing on Virginia interstate carriers of freight any gross receipts or other similar tax; and until further action in the premises."

Governor Battle, on the same date, approved the recommendation and granted reciprocity as therein set out.

The Board was later advised by Judge Ralph T. Catterall, member of the State Corporation Commission charged with the handling of all tax matters, but not a member of the Reciprocity Board, that he feared many Virginia motor carriers could, under the above declaration, avoid the tax by changing their domicile. Because of this view and a desire to obtain uniformity, Governor Battle, acting on advice and recommendation of the Board, issued on June 25, 1952, the following statement or declaration:

"Pursuant to the provisions of Sections 46-21 and 46-22 of the Code of Virginia, the Reciprocity Board hereby advises the Governor to make the following agreement with respect to the gross receipts tax imposed by Section 58-638:

"1. All reciprocity agreements covering the gross receipts road tax heretofore made are cancelled and revoked as of June 30, 1952.

"2. Commencing July 1, 1952, no out-of-state interstate carrier of property shall be required to pay the gross receipts road tax on revenue derived from interstate operations so long as his home state does not require Virginia interstate carriers of property to pay a gross receipts tax, ton-mileage tax or other similar tax on revenue derived from interstate operations.

"3. Provided, however, that reciprocity is not granted in the following cases and does not apply to:

" (a) Revenue derived by a carrier from the transportation in interstate commerce of property received by him in Virginia for transportation to a point in Virginia.

" (b) Revenue derived from the transportation of property by any motor vehicle, tractor, trailer, or semi-trailer required to be registered and licensed in Virginia, or which is owned, in whole or in part, by a citizen of Virginia, or which is owned by a corporation incorporated in Virginia, or which is owned by a corporation a majority of whose stock is owned by citizens of Virginia. Except that reciprocity is granted in the case of pick-up or delivery movements of property in interstate commerce by means of vehicles registered and licensed in Virginia, if the vehicles are owned and operated by the out-of-state carrier who transports the property into or out of Virginia, and if the carrier makes no separate charge for the pick-up or delivery service.

"4. * * *

"5. This unilateral agreement may be revoked without prior notice at any time.

> (s)  C. F. JOYNER, JR.
> (s)  H. LESTER HOOKER
> (s)  J. A. ANDERSON
> Reciprocity Board.

"I approve the foregoing and reciprocity is hereby granted in accordance with the advice of the Reciprocity Board.

> (s)  JOHN S. BATTLE,
> Governor of Virginia.

June 25, 1952."

Judge Ralph T. Catterall, the member of the State Corporation Commission charged with the administration of gross re-

ceipts tax, testified that he drew the declaration of June 25, 1952, and explained the reason therefor as follows:

"The effect of the June agreement is, first, to wipe the slate clean because there had been a great many prior reciprocity agreements giving different types of reciprocity to different states in certain details and there had been the ten-state agreement which I construed not to apply to the gross receipts tax, but I was having argument with Tennessee and Alabama carriers, who claimed it did apply. Now obviously, if we have forty-eight different rules to administer, it is going to cause some confusion and obvious injustice, and, therefore, my suggestion was that we wipe the slate clean and make the same ruling as to reciprocity for the gross receipts tax apply to all the states of the country.

"The second section is a blanket section which exempts all out-of-state carriers from the gross receipts tax so long as their home state does not impose any third level tax on Virginia carriers.

"The third section is a list of exceptions to the second section and gives effect to the policy I mentioned a moment ago of requiring all Virginia citizens and all Virginia vehicles to pay the gross receipts tax.

"Having used the extremely ambiguous term 'home state' in section 2, section 4 was inserted as a partial definition of what is meant by the home state of an out-of-state carrier. We will seldom have cases under section 4; it can arise only if a carrier has relations with two states, one of which is entitled to reciprocity and the other isn't, and section 4 will help us to resolve our problems in those rare instances."

The evidence of all the witnesses was taken by depositions. The three members of the Reciprocity Board, C. J. Joyner, Jr., Commissioner of the Division of Motor Vehicles, General J. A. Anderson, State Highway Commissioner, and H. Lester Hooker, member of the State Corporation Commission, called to testify on behalf of the petitioners, declared that the reciprocity agreement of June 25, 1952, was in the best interests of the Commonwealth. They said that most of the Virginia motor carriers operate through the District of Columbia, Maryland, Pennsylvania, Delaware, and New Jersey to reach the large terminal markets in the northeastern portion of the United States, and they had been informed that if the gross receipts tax was imposed by Virginia on the freight motor carriers of those states, Vir-

ginia freight motor carriers would, in turn, be required to pay taxes in those states. They thought that the imposition of such out-of-state taxes would be prohibitive to Virginia carriers engaged in interstate commerce. They admitted that they did not know, or inquire, whether all of the States of the Union actually imposed a gross receipts or comparable tax upon carriers for hire. They were of opinion that the collection of the tax on foreign carriers by Virginia would bring retaliation from those states which had enacted no such tax statute, whereas the granting of reciprocity would "encourage" foreign states without such tax statute to forego its enactment. For these reasons, they construed the unilateral agreement of June 25, 1952, as applicable to all states which refrain from requiring Virginia carriers to pay comparable taxes, regardless of the laws of such other states relating thereto.

Commissioner Ralph T. Catterall testified positively and directly to the same effect.

It is further pointed out that since the enactment of § 46-22, the General Assembly of Virginia has met for five regular sessions, and no change in the administrative policy adopted by the Board and the Governor has been made.

C. F. Joyner, Jr., who has served as Chairman of the Reciprocity Board since it was organized, said that after Governor Tuck issued his declaration of October 28, 1949, the State Corporation Commission relied on it as authority for not collecting the gross receipts tax from any foreign motor carrier when the home state of such carrier refrained from requiring Virginia carriers to pay a similar tax, whether such abstention was from taxes imposed by local law or because there was no local statute imposing comparable taxes.

C. Fair Brooks and G. A. Mundy, Presidents, respectively, of Brooks Transportation Company and Mundy Motor Lines, both Virginia motor carriers engaged in interstate commerce, corroborated the testimony of the members of the Reciprocity Board. They were of opinion that the imposition of mileage or comparable taxes by foreign states on motor vehicle carriers of property would seriously curtail the interstate trucking industry in Virginia and injuriously affect the economic interests of the State.

J. E. Bullock, traffic manager for a large paper manufacturing corporation which employs private carriers, thought that any

interruption or interference in this method of trucking by the imposition of taxes would put his industry out of a position to meet competition in its business.

Dr. W. L. Gibson, Jr., Professor of Agricultural Economics at the Virginia Polytechnic Institute, said that a large portion of Virginia poultry, dairy and livestock products are moved by motor truck to terminal markets in Washington, Baltimore, Philadelphia, Jersey City, and New York; that he knew of no other form of transportation as efficient for the purpose of getting such products to those markets; and that any interference ''with the free movement of trucks across our state lines would reduce the efficiency with which we could market our agricultural products,'' and ''this would mean that we would lose a large part of the comparative advantage which we have at the present time.''

Other representatives of the fruit, vegetable, agricultural and manufacturing interests testified that the imposition by other states of a motor vehicle tax on Virginia carriers in interstate commerce would have a disastrous effect upon the economy of their several occupations and industries.

A. S. Boatwright, who has been handling tax matters for the Commission since 1938, said that a large sum was lost to the Commonwealth by reason of the failure to impose and collect the gross receipts tax since 1943. He estimated that if the tax had been collected in 1951, the amount would have been approximately $1,336,300.

It was also in evidence that since the institution of this proceeding, the State Corporation Commission has withdrawn the provisions of the reciprocity agreement of June 25, 1952, as to motor carriers from New York and Pennsylvania. The withdrawal from New York followed a decision of the New York Court of Appeals[1] requiring the payment of that State's ton-mile tax by domestic and foreign carriers alike. The withdrawal from Pennsylvania was due to a decision of a Court of Common Pleas of that State,[2] wherein the gross receipts tax of Pennsylvania was ordered to be imposed and collected from the motor carriers of Virginia and other states. Both withdrawals were made retroactive to January 1, 1952.

In the briefs much space is devoted to a highly technical

---

[1] *Mid-States Freight Lines* v. *Bates*, 304 N. Y. 700, 107 N. E. 2d 603.

[2] *Shinks Motor Express Corp.* v. *Messner*, Court of Common Pleas of Dauphin County (August 25, 1952).

and dialectical discussion of the meaning of the words "agreement," "reciprocity" and "taxes imposed," employed in § 46-22.

Judge Cardozo, in *Wood* v. *Lucy, Lady Duff-Gordon,* 222 N. Y. 88, 118 N. E. 214, said: "The law has outgrown its primitive state of formalism when the precise word was the sovereign talisman, and every slip was fatal. It takes a broader view today. A promise may be lacking and yet the whole writing may be 'instinct with an obligation,' imperfectly expressed."

In *Norfolk So. Ry. Co.* v. *Lassiter,* 193 Va. 360, 368, 68 S. E. 2d 641, we said:

"On more than one occasion this court has held that the letter of a statute should not be allowed to destroy its spirit and thwart its purpose. Thus, in *Tabb* v. *Commonwealth,* 98 Va. 47, 56-7, 34 S. E. 946, 949, 51 L. R. A. 283, it was said: 'A provision of a section of a statute ought not to receive a mere literal interpretation, when it would contravene the intention of the Legislature apparent from the other sections and provisions thereof, but the words are to be expanded or qualified to effectuate the intention. Sutherland on Stat. Con., secs. 218, 246, 324; Endlich on Int. of Stat., sec. 115; *Reiche* v. *Smythe,* 13 Wall. (80 U. S.) 162, 20 L. ed. 566; and *Orange, etc., R. Co.* v. *City Council of Alexandria,* 17 Gratt. (58 Va.) 176.' "

While the wording of the Reciprocity Act is not as clear as it might be, we think the answer to the question whether the Governor's declaration of June 25, 1952, is in compliance with it, is to be found in the statute construed as a whole, in the spirit and purpose of its enactment, and in the realities of the situation. Subtleties of meaning should not be allowed to circumvent the legislature's manifest purpose and destroy a formulated scheme of reciprocity, tho inartificially expressed.

Since 1932, the General Assembly, with respect to registration of motor vehicles, has repeatedly extended privileges to non-resident owners of foreign motor vehicles operated in Virginia, when the same privileges are granted to residents of Virginia by the state, district or county wherein such non-resident owners are residents. Virginia Code, 1950, §§ 46-110, 46-111, 46-115, 46-117, 46-118, 46-120 and 46-122.

These several Acts and Code, § 46-22 lay down a broad policy directive; that is, the policy of allowing residents of other states the free use of roads of Virginia when the home states of such non-residents allow the free use of their roads to residents of Virginia. Code, § 46-22 does not prescribe the form of agree-

ments which the Governor may make to effect this policy, whether they shall be oral or written, formal or informal, unilateral or bilateral. The form is left to the discretion of the Governor. And in our opinion the form is immaterial, if the object sought is attained.

The language of Code, § 46-22 is broad and expansive. It is instinct with the objective just stated. In the first sentence the Governor is given authority, with the advice of the Board, to enter into reciprocal agreements with the appropriate authorities of any state "with respect to all taxes imposed by this State and by any such other state on motor vehicles, * * *." We need not indulge in any play upon the words "taxes imposed." An agreement to refrain from imposing taxes may be as much a "subject of reciprocity" as an agreement not to require the payment of "taxes imposed." Considering the purpose of the Act, and its provisions as a whole, we think that the words used therein are broad enough to allow agreements whereby foreign states will refrain from imposing taxes on Virginia interstate carriers, as well as agreements whereby such states will refrain from requiring Virginia interstate carriers to pay taxes imposed by such foreign states. We are supported in this view by the language of the second paragraph, which says that where there is a statute expressly dealing with "any subject of reciprocity," the reciprocal agreement shall conform to the provisions of such statute; but that, "As to *any other subject of reciprocity appropriate to the powers vested in the Governor by this section,* the Governor may, * * * agree to such terms and conditions as in his judgment are best calculated to promote the interests of the Commonwealth." (Italics added.)

The abstention of other states from the enactment of a statute imposing taxes upon Virginia interstate carriers produces the same result as a waiver of the payment of taxes actually imposed. An agreement, or understanding, formal or informal, written or oral, with reference to such taxes, evidenced by the mutual assent or the acquiescence of the states interested, which brings the result desired is a "subject of reciprocity appropriate to the powers vested in the Governor" by § 46-22.

We are not especially concerned whether the agreement authorized to be executed by the Governor be unilateral or bilateral. A bilateral contract is one in which each party promises some performance. A unilateral contract is where only one party promises performance, the consideration from the

promisee being actually given and being something other than a promise. 1 Williston on Contracts, § 13.

In Restatement of the Law of Contracts, Vol. 1, § 75, "consideration" is defined as follows:

"(a) an act other than a promise, or

(b) a forbearance, or

(c) the creation, modification or destruction of a legal relation, or

(d) a return promise, bargained for and given in exchange for the promise.

Consideration may be given to the promisor or to some other person. It may be given by the promisee or by some other person.

\* \* \*"

"Comment:

(d) In unilateral contracts the consideration is something other than a promise. It may be a specified act or forbearance, or any one of several specified acts or forbearances of which the offeree is given the choice, or such conduct as will produce a specified result. \* \* \*"

In this case the declaration of June 25, 1952, says to the other states: "If you will refrain from requiring Virginia interstate carriers of property to pay a gross receipts tax or similar tax on revenue derived from their interstate operations, Virginia will refrain from collecting its gross receipts road tax on your interstate carriers of property." It is a promise for a forbearance, and when another state accepts that promise, either by acquiescence or by express committal, a mutual pact is made with Virginia within the meaning of our Act.

In *Twohy* v. *Harris*, 194 Va. 69, 81, 72 S. E. 2d 329, 336 the following statement from 12 Am. Jur., Contracts, § 14, page 512, is quoted with approval:

" '\* \* \* where one makes a promise conditioned upon the doing of an act by another, and the latter does the act, the contract is not void for want of mutuality, and the promisor is liable though the promisee did not at the time of the promise engage to do the act; for upon the performance of the condition by the promisee, the contract becomes clothed with a valid consideration which renders the promise obligatory.'

"See also, *Norfolk Southern R. Co.* v. *Harris, supra,* (190 Va. at page 976, 59 S. E. (2d), at page 115)."

■ The statute does not define who are the "appropriate authorities of any state." This Commonwealth cannot and does not undertake to prescribe the names or duties of the authorities of a sister state, or the method whereby such state can impose or waive the imposition of a tax. It may be presumed that the General Assembly was aware of the fact that some states do not impose a gross receipts tax upon carriers of property for hire, and that other states have no designated officers to execute agreements relating to the subject here involved. Unless, in such instances, those states be allowed to accept the offer of reciprocity from Virginia, this State's policy of obtaining the free movement of commerce and trade might well be hampered and frustrated.

Taxation is a very sensitive subject. When tax authorities are seeking revenue from every available source, it is ignoring the facts of business life to say that a proclamation by an appropriate state official offering relief from taxation does not amount to the communication of such offer to the public. It can hardly be doubted that motor vehicle carriers and the tax authorities of each state keep themselves fully informed of any proposed measure imposing or waiving taxes.

The contention of petitioners that the Governor's declaration of June 25, 1952, is not a "reciprocal agreement," is opposed to the policy of the State declared by its legislature. Such contention is in conflict with the realities of the situation and destroys the practical benefits intended to be derived from a broad and liberal construction of Code, § 46-22.

■ We find no merit in the argument that the declaration of June 25, 1952, does not promote the interests of the Commonwealth. The legislature entrusted the Governor, aided by the advice of the Board, to agree to such terms and conditions as in his judgment are best calculated to promote the interests of the Commonwealth. It is for the Governor and not for us to determine whether the reciprocity proposed in his declaration is favorable to the interests of this State. The uncontradicted evidence shows that the imposition of a gross receipts, ton-mileage or similar tax by other states upon Virginia motor interstate carriers would result in a curtailment in the service of such carriers and an increase in transportation rates which would adversely affect, either directly or indirectly, the best economic interests of Virginia. The Governor has determined that the

advantages gained by reciprocity are greater than the disadvantages, and the evidence supports his judgment.

The fact that a large sum might be collected in gross receipts taxes but for the reciprocity agreement complained of is not the controlling factor in determining whether or not that agreement promotes the interests of this State. The welfare of a state is not measured by the amount of taxes it imposes on a particular subject. The situation must be considered in relation to the advantages gained by not collecting the tax as opposed to the disadvantages in the loss of revenue. Taxation is, or ought to be, along with other requirements, based on the needs of a state, the ability of the taxable subject to bear it, and its impact upon the economic welfare of the state. Subsidization or the waiver of taxes is often granted to promote the interest of the taxable subject, and thereby advance the welfare of the state as a whole.

Finally, petitioners contend that Code, § 46-22, as construed and applied by the Reciprocity Board and the Governor of Virginia contravenes § 163 of the Constitution of Virginia, and, as a result, is in conflict with the Fourteenth Amendment to the Constitution of the United States, because it permits *corporate* foreign motor carriers to enjoy a competitive advantage over *corporate* Virginia motor carriers.

It is not claimed that reciprocity agreements are forbidden by § 163 of the Constitution when they bring about an exchange of benefits substantially equal. The attack is based on the ground that there can be a valid exchange only where the foreign state ''has and imposes on its own carriers a gross carriers a gross receipts or other similar tax.'' It is argued that this situation does not exist with respect to Virginia carriers and corporate motor carriers from the State of Georgia, because Georgia has no gross receipts tax on its statute books. Therefore, Georgia carriers pay no such tax in their state and none in Virginia because of its reciprocity policy, whereas Virginia carriers pay the Virginia tax.

The question before us is not as narrow and simple as that presented by this example. The contention of petitioners is based on the erroneous premise that there is no mutual or reciprocal waiver of road taxes between Virginia and Georgia, because no such taxes are imposed by the latter state. It overlooks several essential factors, the purpose of Code, § 46-22, the

consideration upon which the Virginia declaration of reciprocity is founded, and the results accomplished.

Section 163 of the Constitution provides that: "No foreign corporations shall * * * be permitted to do anything which domestic corporations are prohibited from doing, or be relieved from compliance with any of the requirements made of similar domestic corporations by the Constitution and laws of this State, where the same can be made applicable to such foreign corporation without discriminating against it. * * *"

The clear purpose of the constitutional provision is to deny foreign corporations any advantage over domestic corporations. *DuPont Company* v. *Harvey Company,* 156 Va. 582, 591, 158 S. E. 891.

The word "corporation" is defined in § 153 of the Constitution to include, "trusts, associations and joint stock companies having any powers or privileges not possessed by individuals or unlimited partnerships. * * *," and is employed in § 163 in a technical sense. *Railway Express Agency* v. *Commonwealth,* 153 Va. 498, 504, 150 S. E. 419. Thus, the prohibitions of the latter section are directed to corporations as such, and not because of a classification of their business.

The gross mileage tax imposed by § 58-638 is a road tax levied on the "person" who operates or causes to be operated a motor vehicle on the highways of this State for compensation, whether such "person" is a foreign or domestic corporation or a resident or non-resident natural person. It is not a tax levied upon such "person" because he is a natural person, or because it is a corporation; but because of the nature of the use of the highway by such "person." Whether the owner of the vehicle operated is a corporation or a natural person is merely an incident of the business of the carrier, not of the carrier's use of the highway.

Furthermore, neither does § 46-22 or Governor Battle's declaration of June 25, 1952, relieve a corporate foreign motor carrier from compliance with the provisions of § 58-638, because it is a corporation. Nor does § 46-22 or the said declaration relate to the imposition or collection of taxes by foreign states upon the carriers of those states. Section 46-22 provides for reciprocal agreements, whereby Virginia interstate carriers may obtain the free use of the roads of other states in return for

a similar privilege granted by Virginia to carriers from such other states. Thus, agreements made under it bring about an exchange of privileges substantially equal. All Virginia inter-state carriers, corporate and unincorporate, obtain the same benefit, regardless of the requirement that they pay taxes imposed by Virginia. They get something, which they might not otherwise get, for something given.

Foreign states may lawfully impose taxes upon domestic and foreign carriers, reasonably related to the use of their roads. Whether they impose such taxes, or waive the payment of taxes imposed, is a matter of local policy over which Virginia has no more control than it has in the determination of the amount of the taxes. Virginia may, however, contract with a foreign state that the latter will not impose taxes on Virginia interstate carriers, or require such carriers to pay taxes imposed by its statute, in exchange for a similar exemption granted by Virginia to carriers of the foreign state.

If corporate foreign carriers obtain a competitive advantage in the matter of taxation, by the failure of their home states to impose taxes upon them, or to require the payment of a tax imposed, the advantage received is not because of the reciprocity agreement with Virginia. The taxation of foreign motor carriers in their home states is, of course, a factor in the costs of carrying on their business; but it is merely one of the many factors of their business operations over which Virginia has no control.

In the application and administration of the Virginia reciprocity agreement, all Virginia interstate carriers, corporate and unincorporate, obtain a substantial benefit in the free use of the roads of a foreign state in return for similar benefits granted carriers of the foreign states, a typical example of reciprocity. Whether the benefit obtained by Virginia carriers is equal or superior to the benefits gained by foreign carriers is a question of fact. As to such fact, the record discloses that representatives and agents of Virginia motor carriers have testified, without contradiction, that reciprocity as applied in Virginia works to the economic advantage of the Commonwealth and its domestic carriers, corporate and unincorporate.

Under the facts and the applicable law, we are of opinion that the declaration of Governor Battle of June 25, 1952, was not

in excess of the authority conferred upon him by Code, § 46-22, and not in contravention of the Constitution of Virginia or of the Constitution of the United States.

For the foregoing reasons, we are of opinion that the petition for a writ of mandamus should be denied, and it is so ordered.

*Mandamus denied.*