**Anthony F. ALBANESE, Plaintiff,**

v.

**WCI COMMUNITIES, INC., and WCI Mid–Atlantic U.S. Region, Inc., Defendants.**

No. 1:07cv280 (GBL).

United States District Court, E.D. Virginia, Alexandria Division.

Dec. 7, 2007.

Elaine C. Bredehoft, Charlson Bredehoft & Cohen, PC, Reston, VA, for Plaintiff.

Alexander Tevis Marshall, David Edward Constine, III, Troutman Sanders, Richmond, VA, for Defendants.

### *AMENDED MEMORANDUM ORDER*

GERALD BRUCE LEE, District Judge.

THIS MATTER is before the Court on Defendants WCI Communities Inc. and WCI Mid–Atlantic U.S. Region, Inc's (hereinafter collectively referred to as "WCI") Motion for Summary Judgment. This case concerns certain promises made to Plaintiff Anthony F. Albanese by WCI during the course of his employment with WCI and relocation to the Washington, D.C. metropolitan area. There are three issues before the Court. First, whether Defendants breached their employment contract with Plaintiff when Defendants promised to potentially relocate Plaintiff, provide Plaintiff a specific bonus structure, and reimburse Plaintiff for certain relocation expenses. Second, whether Defendants committed actual fraud and fraud in the inducement when representing to Plaintiff that he could potentially relocate back to Florida. Third, whether Defendants committed constructive fraud when they failed to perform on promises made to Plaintiff during the course of employment. The Court grants Defendants' Motion for Summary Judgment on Count I (breach of contract) as it relates to Plaintiff's potential relocation claim because the parties did not form a valid contract and on Plaintiff's claim that Defendants promised a certain bonus structure because this oral statement fell within the statute of frauds. The Court denies Defendants' Motion for Summary Judgment on Count I (breach of contract) as it relates to Plain-

tiff's claim that Defendants promised to reimburse certain relocation expenses because a material fact exists about what the parties intended when Defendants agreed to pay Plaintiff's "reasonable closing costs." The Court grants Defendants' Motion for Summary Judgment on Count II (actual fraud and fraud in the inducement) because Defendants' statement referred to future events and Plaintiff has not demonstrated that Plaintiff's supervisor knew that certain information was false when he communicated it to Plaintiff. The Court grants Defendants' Motion for Summary Judgment on Count III (constructive fraud) because all three of Plaintiff's allegations concern future events or unfulfilled promises and no evidence exists to show that Plaintiff's supervisor did not believe the information when he communicated it to Plaintiff.

## I. Background

### Initial Employment with WCI

Defendant WCI Communities, Inc. operates a tower development organization and functions as the parent company of Defendant WCI Mid–Atlantic Region, Inc., a wholly-owned subsidiary of WCI focused on building single-family homes and townhouses in the Mid–Atlantic region. (Pl.'s Ex. 6, Albanese Dep. 64:15–65:13, Aug. 15, 2007 (hereinafter "Albanese Dep.").) On May 5, 2004, WCI sent Plaintiff, Anthony Albanese, a letter to offer him a position as the Vice President and Senior Project Manager for one of WCI's tower divisions in Sunrise, Florida. (Pl.'s Ex. 1.) In this position, Mr. Albanese would receive a base compensation rate of $200,000.00 per year and was eligible to participate in WCI's Management Incentive Compensa-

tion Plan (hereinafter "MICP") for the 2004 calendar year.[1] *Id.* The May 5, 2004 offer letter advised Mr. Albanese that he was eligible for a bonus equivalent to 60% of his base salary under the MICP program to be calculated under the terms and conditions of this program. *Id.* This same letter further provided that Mr. Albanese would report directly to Paul Drummond, WCI Division President of the East Coast region. *Id.;* (Pl.'s Ex. 17). The offer letter also indicated that Mr. Albanese would serve as an "at-will" employee. (Pl.'s Ex. 1.) Mr. Albanese signed the May 5, 2004 offer letter on May 9, 2004, and began working for WCI on May 14, 2004. *Id.;* (Pl.'s Mem. 1).

### Promotion to Division President—Mid–Atlantic Tower Division

In the summer of 2004, Christopher Hanlon, Senior Vice President and Chief Operating Officer of WCI's Tower Home Building Division, approached Mr. Albanese about a promotion involving the opportunity to relocate to the Washington, D.C. metropolitan area. (Pl.'s Ex. 2, Hanlon Dep. 6:15–17, 10:22, 14:24–15:17, Sep. 12, 2007 (hereinafter "Hanlon Dep.").) Mr. Hanlon subsequently sent Mr. Albanese a formal offer letter on August 19, 2004, offering Mr. Albanese the position of Division President—Mid–Atlantic USA Tower Operations for WCI, reporting directly to Mr. Hanlon. (Pl.'s Ex. 3.) The position required that Mr. Albanese relocate to the Washington, D.C. area. *Id.* Mr. Albanese proposed changes to the terms of the offer (Pl.'s Ex. 4), and Mr. Hanlon then sent Mr. Albanese a revised copy of the offer letter on August 25, 2004. (Pl.'s Ex. 5).[2]

---

1. WCI established this incentive program, the Management Incentive Compensation Plan, to reward key employees for performances that significantly impact WCI's achievement of its annual financial goals. (Def.'s Ex. B.)

2. Mr. Albanese had asked that Mr. Hanlon increase the base salary offer due to the higher cost of housing in the Washington, D.C. area, reimburse temporary housing costs for nine months, set the start date for September

The August 25, 2004, revised offer letter increased Mr. Albanese's base salary to $325,000.00 per year, a $25,000.00 increase from the original offer of $300,000.00 per year.[3] *Id.;* (Pl.'s Ex. 3). The revised offer also set Mr. Albanese's target bonus under the MICP program to 65% of his base annual salary, an increase from the original offer of 60% of his base salary. *Id.* The offer letter further stated:

> Of course, as you know, there are both upside and downside [sic] based on achievement of financial objectives, but I believe it is noteworthy that the top end [sic] (160% of bonus) you could earn $663,000 salary and bonus under our current compensation program, compared to your current maximum compensation level of $320,000 [sic].

*Id.* The offer also indicated that Mr. Albanese's MICP bonus for 2004 would be pro-rated. *Id.*

In the August 25, 2004 offer letter to Mr. Albanese, Mr. Hanlon further agreed to pay certain costs related to Mr. Albanese's relocation to the Washington, D.C. area, specifically:

> ▶ Payment of costs related to the movement of your household goods and items as well as your personal vehicles.
>
> ▶ Up to nine months of temporary housing or dual residence expense as you identify your place of [primary] residence in the Maryland area.

> ▶ A cash miscellaneous relocation allowance of $5,000 payable at the time you would move to Maryland.
>
> ▶ Payment of all reasonable closing costs related to both the sale and purchase of primary residence. The major part of this being sales commission.
>
> ▶ All relocation items incurred would be grossed up for personal tax purposes leaving you with no out of pocket expenses related to your move.

(Pl.'s Ex. 5.) The letter then stated: "[r]egardless of your decision, you know you have a home here at WCI and your career will not be impeded either way."[4] *Id.* Mr. Albanese signed the letter accepting the terms, and began his new position in early September 2004.[5] (Albanese Dep. 54:10–17.)

### Mr. Hanlon's statements about Mr. Albanese's potential to return to Florida

As part of the discussions surrounding the terms of the August 25, 2004 offer letter promoting Mr. Albanese to Division President, Mr. Hanlon told Mr. Albanese that an opportunity existed for Mr. Albanese to return to Florida if WCI ceased business in the Mid–Atlantic region. (Albanese Dep. 104:14–21.) According to Mr. Hanlon, he told Mr. Albanese that:

> If while we're up there[, pursuing the Mid–Atlantic region,] we determine that we are not going to continue with tower operations or pursue tower opportunities in the Mid–Atlantic, that I would bring

10, 2004, extend personal travel reimbursement through the end of December 2004, and appoint Mr. Albanese to Vice President of WCI Communities, Inc. (Pl.'s Ex. 4.)

**3.** The August 24, 2004 offer letter did not specify whether or not Mr. Albanese would serve as a Division President at-will. (Pl.'s Ex. 5.)

**4.** Mr. Hanlon testified that the language in the letter was meant to assure Mr. Albanese

that his current position and future possibilities for promotion would not be affected should he turn down the offer. (Hanlon Dep. 60:12–22.)

**5.** The record does not include a signed copy of the offer letter, but Mr. Albanese testified that he signed and accepted the offer letter dated August 25, 2004. (Albanese Dep. 54:10–17.)

[Mr. Albanese] back to Florida with the same position he had when he left. (Hanlon Dep. 62:20–63:2.) Mr. Albanese interpreted Mr. Hanlon's comments to mean that if "things did not work out for one reason or the other" and Mr. Albanese decided that he wanted to return to Florida, Mr. Hanlon would bring him back in a comparable position. (Albanese Dep. 104:1–2, 104:22–105:5.) This understanding influenced Mr. Albanese's ultimate decision to accept the promotion and move to the Washington, D.C. area. (Albanese Dep. 204:7–11.)

On February 14, 2005, WCI acquired Renaissance Housing. (Albanese Dep. 64:11–12.) Renaissance Housing's owner, Sonny Small, became President of Mid–Atlantic Towers, an entity focused on building single-family homes and townhouses for WCI. (Albanese Dep. 64:9–11, 64:15–16, 65:11–13.) About thirty days after the acquisition, Mr. Albanese began reporting to Mr. Small instead of Mr. Hanlon. (Albanese Dep. 65:1–4.) Mr. Albanese subsequently expressed concerns to Mr. Hanlon about the acquisition of Renaissance Housing because he believed that the change in management may not have a positive outcome. (Albanese Dep. 152:3–5; Pl.'s Mem. Opp. Summ. J. 15 (hereinafter "Pl.'s Mem.").) Mr. Hanlon reiterated that if "things did not work out," Mr. Albanese could return to Florida. (Albanese Dep. 152:19–153:5.) According to Mr. Albanese, he decided to stay with WCI and work underneath Mr. Small after the Renaissance Housing acquisition based on Mr. Hanlon's statements. (Albanese Dep. 204:21–205:2.)

**Mr. Albanese's 2005 MICP bonus**

The 2005 MICP indicates that the bonus allocation for operating personnel would be derived from corporate financial objectives (20%) and division/project objectives and/or personal objectives (80%). (Pl.'s Ex. 14.) The 2005 MICP bonus plan provided for the award of a discretionary bonus with the prior approval of Jerry Starkey, the President and CEO of WCI in 2005. (Pl.'s Ex. 15; Pl.'s Mem. 2.)

The August 25, 2004, offer letter referenced Mr. Albanese's eligibility to receive a bonus in 2004 pursuant to WCI's MICP program. (Pl.'s Ex. 5.) During the discussions regarding Mr. Albanese's promotion to Division President, Mr. Albanese testified that Mr. Hanlon told him that his 2004 and 2005 MICP would be based on the success of the overall Tower Division. (Albanese Dep. 138:10–15.) Mr. Hanlon told Mr. Albanese orally that Mr. Albanese's MICP bonus for the fourth quarter of 2004, during which Mr. Albanese served as the Mid–Atlantic Division President, would be based 80% on the total tower division and based 20% on corporate financials. (Hanlon Dep. 39:8–17.) Mr. Hanlon testified that Mr. Albanese's 2005 MICP bonus was based on Mr. Albanese's performance in the Mid–Atlantic region. (Hanlon Dep. 37:23–25.) On January 26, 2005, Mr. Hanlon informed Mr. Albanese via email that Mr. Albanese's "2005 MICP percentage was raised to 100%" of his base salary. (Pl.'s Ex. 7.) Mr. Albanese understood this increase in percentage to mean that he "could achieve a hundred percent addition of [his] base salary as part of that and that there were no specific projects within the Tower Division for 2005 as set [ ] objectives, that [they] would continue with the [MICP] bonus based on the overall performance of the Tower Division." (Albanese Dep. 89:10–15.) The 2005 WCI business plan accounted for the Mid–Atlantic region, but did not include an income projection because WCI did not foresee any acquisitions in the Mid–Atlantic region that could earn a profit in 2005. (Hanlon Dep. 38:24–25, 42:18–43:15.)

In the spring of 2006, Mr. Small recommended to Mr. Hanlon that Mr. Albanese not receive a bonus for 2005 because Mr. Small believed that Mr. Albanese had not achieved the goals Mr. Small and Mr. Albanese had discussed.[6] (Hanlon Dep. 77:4–11.) Following this recommendation, Mr. Small, Mr. Hanlon, and Jerry Starkey, met in-person and agreed that Mr. Albanese would not receive a discretionary bonus[7] because Mr. Albanese's performance did not "warrant any additional compensation for his performance in 2005 above and beyond his salary."[8] (Hanlon Dep. 79:1–16; Pl.'s Mem. 2.)

### Relocation Expenses

Mr. Albanese has not been reimbursed for certain relocation expenses incurred in conjunction with his promotion to Division President and subsequent move to the Washington, D.C. area.[9] (*See* Albanese Dep. 129:9–14.) Specifically, Mr. Albanese has not received payment for:

| | |
|---|---|
| Unpaid closing costs | $72,000.00 |
| Tax gross up adjustment | $ 7,386.87 |
| Closing cost gross up | $30,924.00 |
| Tax gross on rent | $ 1,238.71 |
| Lost interest income | $12,008.30 |

(Pl.'s Ex. 16.) Combined, these costs total $123,609.58. *Id.*

Mr. Albanese testified that WCI agreed to pay "both the commission on the sale and purchase" of the house that Mr. Albanese bought in the Washington, D.C. area in order to make the home more affordable. (Albanese Dep. 130:15–22.) WCI has not reimbursed Mr. Albanese for the seller's commission on the house Mr. Albanese purchased. (Albanese Dep. 130:12–14.) Mr. Albanese also did not receive reimbursement for the gross-up for state taxes. (Pl.'s Mem. 12.) Mr. Albanese requests interest on these monies from February 9, 2005, through November 30, 2007. *Id.*

### Termination

Mr. Albanese met with Mr. Small and Teri Sellars from WCI's Human Resources department on July 11, 2006. (Am. Compl. ¶ 51.) At this meeting, the WCI representatives informed Mr. Albanese that he was terminated "due to economic conditions in the housing market." *Id.* The termination was effective that same day, July 11, 2006. (Def.'s Ex. A.) In an Interoffice Memo sent to Mr. Albanese, WCI informed Mr. Albanese that he was being terminated due to "business related reasons." *Id.* WCI indicated that "the decision [was] due to workforce reductions as necessitated by current business levels." *Id.* Mr. Albanese had not received reimbursement for all of the closing costs and relocation expenses associated with his relocation to the Washington, D.C. area at the time of his termination. (Am. Compl. ¶ 52.)

### Procedural History and Plaintiff's Claims

Mr. Albanese filed his initial Complaint on March 22, 2007. He subsequently filed an Amended Complaint on September 27, 2007. Mr. Albanese's action alleged breach of contract (Count I), actual fraud and fraud in the inducement (Count II),

---

**6.** It is unclear from the pleadings when Mr. Small and Mr. Albanese discussed these goals. Mr. Albanese testified that no one established criteria for him when WCI promoted him to the Mid–Atlantic region. (Albanese Dep. 197:3–9.)

**7.** Mr. Albanese contends that the MICP program provides for specific calculations of the bonuses. (Pl.'s Mem. 10; Pl.'s Ex. 14.)

**8.** Mr. Starkey could not recall whether he had any discussions with WCI management regarding Mr. Albanese's 2005 bonus. (Pl.'s Ex. 12, Starkey Dep. 75:6–18, Sept. 11, 2007.)

**9.** Mr. Albanese has received reimbursement for some of his expenses. (*See* Pl.'s Ex. 16.) Through this action, Mr. Albanese requests payment of $123,609.58 in relocation expenses. *Id.*

and constructive fraud (Count III), which are further delineated below. Mr. Albanese requested compensatory and past and future pecuniary damages on each of Counts I, II, and III. (Am. Compl. ¶ 15.) He further requested punitive and exemplary damages of no more than $350,000.00 on Count II. *Id.* at 15.

### Count I—Breach of Contract

Mr. Albanese claims that WCI offered, and Mr. Albanese accepted, three specific contractual terms in conjunction with Mr. Albanese's employment at WCI. (Am. Compl. ¶ 57.) Mr. Albanese further claims that WCI has breached their employment contract with Mr. Albanese because WCI failed to perform with regards to the three specific terms of the contract. *Id.* ¶ 59. These three specific contractual terms are:

(1) Mr. Hanlon's oral representation to Mr. Albanese that "WCI would find Mr. Albanese comparable employment within WCI back in Florida if the Mid–Atlantic tower division did not prove successful or the situation did not 'work out' for Mr. Albanese" (hereinafter "First Continued Employment" promise). *Id.* ¶ 19. Mr. Albanese alleges that WCI renewed this promise when Mr. Hanlon orally represented to Mr. Albanese following the acquisition of Renaissance Housing that "WCI would find Mr. Albanese comparable employment within WCI back in Florida if the Mid–Atlantic tower division did not prove successful or the new situation did not 'work out' " (hereinafter "Second Continued Employment" promise), *id.* ¶ 34;

(2) Mr. Hanlon's oral representation to Mr. Albanese that "Mr. Albanese's 2005 MICP was to be based upon the success of the entire Tower Division, rather than on the Mid–Atlantic division, since the divi-sion was new, and no Mid–Atlantic division projects were included in the 2005 business plan" (hereinafter "MICP" promise); *id.* at ¶ 26; and

(3) Mr. Hanlon's representation in the August 25, 2004 offer letter to "pay to Mr, Albanese, or in some instances to third parties, expenses and costs related to Mr. Albanese's relocation from Florida to the [Washington, D.C.] area, including the costs and real estate commissions on both the sale and purchase of his primary residence, and the associated tax burdens" (hereinafter "Relocation Expenses" promise), *id.* at ¶ 20.

### Count II—Actual Fraud and Fraud in the Inducement[10]

Mr. Albanese claims that the Second Continued Employment promise made after the acquisition of Renaissance Housing—that "WCI would find Mr. Albanese comparable employment within WCI back in Florida if the Mid–Atlantic tower division did not prove successful or the new situation did not 'work out' "—constitutes both actual fraud and fraud in the inducement. *Id.* at ¶¶ 64, 71.

### Count III—Constructive Fraud

Mr. Albanese claims that the three terms made in conjunction with the Offer Letter Contract—the First Continued Employment promise, MICP promise, and Relocation Expenses promise—and the Second Continued Employment promise all constitute constructive fraud. *Id.* at ¶¶ 76, 77, 79.

### II. Discussion

### A. Standard of Review

Under Federal Rule of Civil Procedure 56(c), the Court must grant summary judgment if the moving party demon-

---

10. Plaintiff's Amended Complaint, filed September 27, 2007, refers to both Breach of Contract and Actual Fraud/Fraud in the Inducement as Count I without identifying an actual Count II. (*See* Am. Compl. 11.) This appears to be an oversight, however, since these Counts are listed separately and Constructive Fraud is referred to as Count III. Therefore, Actual Fraud and Fraud in the inducement will be referred to as Count II.

strates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c). In reviewing a motion for summary judgment, the Court views the facts in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. A "material fact" is a fact that might affect the outcome of a party's case. *Id.* at 248, 106 S.Ct. 2505; *JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir.2001). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *see also Hooven–Lewis v. Caldera*, 249 F.3d 259, 265 (4th Cir.2001). A "genuine" issue concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

## B. Analysis

### *Count I—Breach of Contract*

█ The Court grants Defendants' Motion for Summary Judgment on Count I as it relates to the First and Second Continued Employment promises because Mr. Albanese served as an at-will employee and the promises were too vague in nature, and as it relates to the MICP promise because there is no valid contract under the statute of frauds. The Court denies Defendants' Motion for Summary Judgment on Count I as it relates to the Relocation Expenses promise because a material issue of fact exists about what the parties intended by "reasonable closing costs." (Pl.'s Ex. 5). Under Virginia law, "the essential elements of a cause of action for breach of contract are: (1) a legal obligation of a defendant to the plaintiff, (2) a violation or breach of that right or duty, and (3) a consequential injury or damage to the plaintiff." *Westminster Investing Corp. v. Lamps Unlimited, Inc.*, 237 Va. 543, 379 S.E.2d 316, 317 (1989).

Mr. Albanese alleges that WCI breached their contract with Mr. Albanese because they failed to perform their promises under three separate contractual terms:

1. *First and Second Continued Employment promises:* Mr. Albanese claims that Mr. Hanlon told him on two separate occasions that WCI would find Mr. Albanese comparable employment in Florida if his position with the Mid–Atlantic Tower Division did not "prove successful" or did not "work out." (Am. Compl. ¶ 19). Mr. Hanlon first provided this assurance in conjunction with the discussions surrounding Mr. Albanese's promotion to Division President. Mr. Albanese asserts that Mr. Hanlon reiterated this assurance after WCI acquired Renaissance Housing and Mr. Albanese began reporting to Mr. Small.[11] (Am. Compl. ¶¶ 19, 34.)

2. *MICP promise:* Mr. Albanese claims that Mr. Hanlon told him in 2004

---

11. Mr. Hanlon remembers the first time that

he made this statement to Mr. Albanese in

that his 2005 MICP would be based upon the success of the entire Tower Division and not on the success of the new Mid–Atlantic division in conjunction with the discussions surrounding Mr. Albanese's promotion to Division President. (Am. Compl. ¶ 26; Albanese Dep. 137:7–15.)

3. *Relocation Expenses promise:* Mr. Albanese claims that WCI agreed to pay the seller's commission on the purchase of his home in Maryland as part of the "reasonable closing costs" and accompanying taxes associated with his relocation to the Washington, D.C. area, as expressly provided in the August 25, 2004 offer letter. (Am. Compl. ¶ 20.)

1. **First and Second Continued Employment promises**

The Court grants Defendants' Motion for Summary Judgment on Count I as it relates to both the First and Second Continued Employment promises because Mr. Albanese was an at-will employee and as such could be terminated at any time, and both of these promises are too vague to form a binding contract. Although the First and Second Continued Employment promises were made a year apart, the Court grants summary judgment as it relates to both representations under the same analysis.

**A. At-will employment**

■ The Court grants Defendants' Motion for Summary Judgment as a matter of law on Count I as it relates to the First and Second Continued Employment promises because Mr. Albanese served as an at-will employee, subject to termination by WCI at any time. "In Virginia, an employment relationship is presumed to be at-will, which means that the employment term extends for an indefinite period and

may be terminated by the employer or employee for any reason upon reasonable notice." *Cave Hill Corp. v. Hiers,* 264 Va. 640, 570 S.E.2d 790, 793 (2002). An employee may rebut this presumption if the employment is for a definite period, such as when an employer promises not to dismiss the employee without just cause or if the employee can show that the employer promised additional consideration for the employee's services. *Id.; Sullivan v. Snap–On Tools Corp.,* 708 F.Supp. 750, 751 (E.D.Va.1989); *Miller v. SEVAMP, Inc.,* 234 Va. 462, 362 S.E.2d 915, 917 (1987) (citing *Twohy v. Harris,* 194 Va. 69, 72 S.E.2d 329 (1952) (upholding the employer's promise of stock bonus if the employee remained employed)). Importantly, the Virginia Supreme Court has recognized that "a pleading seeking to recover damages for the termination of a contract of employment, the terms of which give rise to no fair inference of a specific period for its intended duration, and which is not supported by any substantial additional consideration taking it out of the category of an employment at will, is demurrable." *SEVAMP,* 362 S.E.2d at 917–18.

■ Mr. Albanese alleges that WCI breached its contract with regards to the First and Second Continued Employment promises when it terminated Mr. Albanese rather than moving him back to Florida when the Mid–Atlantic region failed to earn income. (Pl.'s Mem. 20.) However, WCI employed Mr. Albanese as an employee at-will, and under Virginia law, the employer may terminate the employment relationship at any time. *Cave Hill Corp.,* 570 S.E.2d at 793.

Mr. Albanese's original May 5, 2004, offer for employment as Vice President and Senior Project Manager specifically indi-

conjunction with the promotion, but does not recall having a second conversation on this

topic after the acquisition. (*See* Hanlon Dep. 20:6–11.)

cated that he would serve as an at-will employee. (Pl.'s Ex. 1.) The August 25, 2004, offer letter that promoted and relocated Mr. Albanese, which Mr. Albanese signed and accepted, created an agreement with certain terms whereby WCI agreed to promote and relocate Mr. Albanese within the same organization. *See Flowers v. Wal–Mart Stores,* 927 F.Supp. 952, 954 (E.D.Va.1996) (holding that if a separate transfer agreement exists, the employer must honor it for some time, but acknowledging that "what that [time] period is remains an issue"). Under *Flowers,* once an employee moves to a new position agreed to by the employee and employer, the employee has satisfactorily fulfilled his or her commitment under the separate agreement. *Id.* In recognition of the employee's actions, the employer is then required to employ the employee in the new position for some undefined period of time. *Id. Flowers* does not bind the employer to any further consideration. *Id.*

Here, WCI employed Mr. Albanese after Mr. Albanese moved to the Washington, D.C. area. WCI therefore fulfilled their commitment under *Flowers* by employing Mr. Albanese after his relocation. *Id.* WCI employed Mr. Albanese as Division President of the Mid–Atlantic Tower Division in the Washington, D.C. area for almost two years, seemingly sufficient considering that *Flowers* left the requisite time period undefined. *Id.* Mr. Albanese is entitled, pursuant to the offer letter, to an annual salary of $325,000.00. Beyond this, Mr. Albanese is again serving as an at-will employee because the August 24, 2004, offer letter does not specify a definite period of employment. *See Cave Hill Corp.,* 570 S.E.2d at 793 (a specified definite time period of employment will take

the employment outside of the at-will doctrine and require "just cause" for termination). While courts have held that in certain instances the provision of additional compensation that serves as an incentive to the employee may rebut the at-will presumption, no such additional compensation is evident in this case. *See SEVAMP,* 362 S.E.2d at 917 (holding that the at-will employment doctrine is not absolute because additional compensation can exist that takes the employment out of the at-will category) (citing *Twohy,* 194 Va. 69, 72 S.E.2d 329). Courts have found that employers can offer such additional compensation with incentives such as stock value, *Twohy,* 72 S.E.2d at 330, or a promise to hold a hearing within five days of termination to determine validity, *Norfolk S.R. Co. v. Harris,* 190 Va. 966, 59 S.E.2d 110, 115 (1950). Here, however, WCI has not provided Mr. Albanese with any monetary compensation in response to any desire to leave WCI. nor does the August 25, 2004, offer letter specify any terms providing additional compensation.

As such, the presumption of at-will employment applies because no evidence to the contrary exists. *See Layton v. MMM Design Grp.,* No. 98–2816, 32 Fed.Appx. 677, 681 (4th Cir.2002) (applying the benefit of the at-will presumption to the Defendants-employer because no evidence existed to rebut the presumption). Both Mr. Albanese or WCI could terminate the relationship at any point upon giving reasonable notice of their intention to terminate.[12] *Swengler v. ITT Corp. Electro–Optical Prods. Div.,* 993 F.2d 1063, 1069 (4th Cir.1993). The Court therefore grants Defendants' Motion for Summary Judgment as a matter of law because neither the First nor Second Continued Em-

---

**12.** Mr. Albanese does not claim lack of reasonable notice for his termination in his Complaint or Memorandum in Opposition.

ployment promise formed a valid contract under Mr. Albanese's at-will employment.

## B. Vagueness prevents the formation of a binding contract

■ The Court also grants Defendants' Motion for Summary Judgment as a matter of law on Count I as it relates to the First and Second Continued Employment promises because the representations are too vague to form a binding contract. An enforceable contract must contain terms that are "sufficiently definite to enable a court to give it an exact meaning." *Smith v. Farrell*, 199 Va. 121, 98 S.E.2d 3, 7 (1957). "Both parties must assent to the same thing in the same sense, and their minds must meet as to all the terms. If any portion of the proposed terms is not settled, or no mode is agreed on by which it may be settled, there is no agreement." *Id.* An agreement must contain definite and certain terms and requirements, identify the subject matter, and detail the essential commitments. *Progressive Constr. v. Thumm*, 209 Va. 24, 161 S.E.2d 687, 692 (1968).

■ Mr. Albanese alleges that Mr. Hanlon's oral statements and the representation in the offer letter promise Mr. Albanese "comparable employment back in Florida" if "things did not work out for one reason or the other." (Pl.'s Mem. 20.) Mr. Albanese summarizes and relies on two separate communications to support these allegations: the First Continued Employment promise, in which Mr. Hanlon told Mr. Albanese around the time of the offer for promotion that he would find Mr. Albanese employment in Florida if WCI did not continue to pursue opportunities in the Mid–Atlantic region,[13] and the Second Continued Employment promise, in which Mr. Hanlon allegedly reiterated this assurance after the Renaissance Housing acquisition.[14] (*See* Pl.'s Mem. 12–16).

Neither the First nor Second Continued Employment promise constitute valid contracts. First, the alleged representations do not provide sufficient detail from which to determine the intentions of the parties. Under the Restatement (Second) of Contracts, "[t]he terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy." RESTATEMENT (SECOND) OF CONTRACTS § 33 (1981). In *Allen v. Aetna Casualty & Surety Co.*, the Virginia Supreme Court indicated its reluctance to find contracts void for indefiniteness or uncertainty, but recognized that a court should not determine the terms of an agreement, even if the parties may ultimately consent to the outcome. 222 Va. 361, 281 S.E.2d 818, 820 (1981). *Allen* involved a settlement agreement that did not contain the parties' mutual commitment on either an exact price or the method or formula to determining the settlement. *Id.* The court found that the agreement was too indefinite and vague to be enforced. *Id.*

Here, and similar to *Allen*, the parties did not sufficiently define or explain the

---

13. Both Mr. Hanlon and Mr. Albanese acknowledge that Mr. Hanlon made a reference to the possibility of returning to Florida for employment, but the parties dispute whether the assurance only pertained to a situation where WCI stopped operations in the Mid–Atlantic region or whether Mr. Albanese could return to Florida if "things did not work out" generally. This dispute, however, does not change the legal analysis because regardless of Mr. Hanlon's actual statement, the oral statement does not constitute a sufficient contract under the law.

14. Mr. Hanlon does not recall making a second assurance to Mr. Albanese. (Hanlon Dep. 20:6–11.) This statement is therefore based on Mr. Albanese's recollections. (Albanese Dep. 152:19–153:5.)

conditions under which Mr. Albanese could return to work in Florida. WCI claims that the alleged agreement does not contain adequate detail to determine when the situation would be ripe for Mr. Albanese to abandon his position in the Mid–Atlantic region and return to WCI's Florida operations. The Court agrees. Like *Allen*, where the parties did not define essential terms and provided no reasonable remedy in case of breach, the parties in this case did not discuss nor commit to when or how Mr. Albanese could return to Florida. Any oral statements made by Mr. Hanlon to Mr. Albanese therefore did not contain definite terms sufficient to constitute a contract.

Second, the parties did not reach a meeting of the minds on the terms of this alleged agreement. *See Allen*, 281 S.E.2d at 820 ("[T]here must be mutual assent of the contracting parties to terms reasonably certain under the circumstances in order to have an enforceable contract"). Mr. Albanese and WCI assert two different interpretations of the statements, and therefore did not agree on the essential terms. *See High Knob, Inc. v. Allen*, 205 Va. 503, 138 S.E.2d 49, 53 (1964) ("Time is usually considered an indispensable term to a definite contract," but a contract will not be void for uncertainty if the parties' intent is ascertainable). Mr. Hanlon testified that he told Mr. Albanese that if "we determine that we are not going to continue with tower operations or pursue tower opportunities in the Mid–Atlantic, [ ] I

would bring [Mr. Albanese] back to Florida with the same position he had when he left." (Hanlon Dep. 62:20–63:2.) Mr. Albanese, however, believed that he could return to Florida if he "didn't feel like it was the right fit in any regard." (Albanese Dep. 104:19–21.) A discrepancy exists with respect to timing regarding an essential condition for Mr. Albanese's potential to return to Florida—whether it exists at Mr. Albanese's discretion or whether it could only happen should WCI cease pursuing business in the Mid–Atlantic region. The parties did not reach a conclusive agreement with regard to this oral statement.[15]

The Court therefore grants Defendants' Motion for Summary Judgment as a matter of law because the First and Second Continued Employment promises did not contain definite terms specifying when Mr. Albanese could return to Florida nor did the parties reach an agreement on the essential terms of the promise.

## C. Conclusion

The Court therefore grants Defendants' Motion for Summary Judgment as a matter of law on Count I as it relates to the First and Second Continued Employment promises because no material issues of fact exist. Mr. Albanese served as an at-will employee of WCI and WCI could therefore terminate Mr. Albanese's employment at any time. Furthermore, sufficient detail required for the formation of a binding

---

**15.** In his Memorandum in Opposition to Summary Judgment, Mr. Albanese also references the language in the August 25, 2004 offer letter, stating that Mr. Albanese has "a home here at WCI and [his] career would not be impeded either way." This language does not contain any promise related to the possibility of relocation back to Florida. When an agreement contains unambiguous language, courts should review the terms in the agreement itself because this constitutes the "re-pository of the final agreement of the parties." *Va. Elec. & Power Co. v. N. Va. Reg'l Park Auth.*, 270 Va. 309, 618 S.E.2d 323, 326 (2005). The plain terms of this statement only promise that Mr. Albanese would retain a position with WCI should he refuse to accept the promotion. This language does not promise Mr. Albanese any specific type or location of employment if he chooses to accept the offer.

contract does not exist with regards to either the First or Second Continued Employment promise.

## 2. MICP promise

The Court grants Defendants' Motion for Summary Judgment on Count I as it relates to the MICP promise because any representation made by Mr. Hanlon about the calculation of Mr. Albanese's MICP bonus is not enforceable under the statute of frauds. Section 11–2 of the Code of Virginia states:

> Unless a promise, contract, agreement, representation, assurance, or ratification, or some memorandum or note thereof, is in writing and signed by the party to be charged or his agent, no action shall be brought ... upon any agreement that is not to be performed within a year.

VA.CODE ANN. § 11–2(8). Virginia's statute of frauds exists to "provide reliable evidence of the existence and terms of certain types of contracts...." *Lindsay v. McEnearney Assoc., Inc.*, 260 Va. 48, 531 S.E.2d 573, 575 (2000). As such, parties are required to commit to writing the terms of agreements that will not be performed within a year. *See Frazier v. Colonial Williamsburg Found.*, 574 F.Supp. 318, 320 (E.D.Va.1983).

Under a statute of frauds analysis, this oral representation does not form a binding contract because it falls within the statute of frauds and the parties did not memorialize the terms in writing. Moreover, the equitable estoppel doctrine does not apply as a matter of law. Mr. Albanese's allegations that the statute of frauds does not apply lack merit. The Court therefore grants Defendants' Motion for Summary Judgment on Count I as it relates to the MICP promise because the parties did not form a valid contract pursuant to the statute of frauds.

## A. The MICP promise falls within the statute of frauds

■ The Court grants Defendants' Motion for Summary Judgment on Count I as it relates to the MICP promise because the MICP promise falls within the statute of frauds. "The primary object [of the statute of frauds is] to prevent the setting up of pretended agreements and then supporting them by perjury." *Lindsay*, 531 S.E.2d at 575. As such, for a court to find an enforceable contract, an agreement that will not be performed within one year must be committed to writing and signed by the party to be charged. VA.CODE ANN. § 11–2(8). The statute of frauds applies to Mr. Hanlon's alleged MICP promise because the terms could not be performed within one year of the promise. Mr. Albanese alleges that Mr. Hanlon "promised Mr. Albanese that his 2005 bonus would be based on the success of the entire Tower Division." (Pl.'s Mem. 21.) Mr. Hanlon allegedly made the MICP promise sometime around August 2004. *Id.* Bonuses awarded for the 2005 calendar year could not be calculated until January 1, 2006. (*See* Def.'s Mem. 14; Def.'s Ex. C.) MICP payments were not payable until the first quarter in 2006. (*See* Def.'s Mem. 14.) Therefore, any bonus that Mr. Albanese could have received under the MICP program would have been calculated and awarded at least fifteen months following Mr. Hanlon's oral statement. This agreement therefore falls within the statute of frauds pursuant to Section 11–2(8) of the Code of Virginia, which governs all agreements not to be performed within a year. The parties did not commit the terms of this agreement to a signed writing and it therefore does not constitute an enforceable contract.

■ Mr. Albanese argues that WCI is prevented from raising the statute of

frauds as a defense by the doctrine of equitable estoppel. (Pl.'s Mem. 23–24.) *Nargi v. CaMac Corp.* analyzed the modern equitable estoppel rule as applied in Virginia. 820 F.Supp. 253 (W.D.Va.1992). "To establish equitable estoppel in Virginia, it is not necessary to show actual fraud, but only that the person to be estopped has misled another to his prejudice ... *or that the innocent party acted in reliance upon the conduct or misstatement by the person to be estopped.*" *Id.* at 256 (citing *T. v. T.,* 216 Va.867, 224 S.E.2d 148, 152 (1976)) (emphasis added). This modern rule abandons the old rule, which required a demonstration of fraud or deceit. *See* WILLISTON ON CONTRACTS, § 533A at 806 (3d ed.1960). Under the current rule, if a party cannot make a showing of fraud or deceit, the party must demonstrate (1) a representation; (2) reliance; (3) a change of position; and (4) detriment in order to establish equitable estoppel. *Id.* Both the Fourth Circuit and Supreme Court of Virginia recognize that:

> It is not necessary that the representations and conduct should be [labeled] as fraudulent in a strict legal sense or that they were made or carried on with an intention to mislead the plaintiff.... A person is estopped from denying the consequences of his conduct where that conduct has been such as to induce another to change his position in good faith or such that a reasonable man would rely upon the representations made.

*U.S. for Use and Benefit of Humble Oil & Ref. Co. v. Fidelity & Casualty Co.,* 402 F.2d 893, 898 (4th Cir.1968); *T. v. T.,* 224 S.E.2d at 152. In *Nargi,* an employer verbally guaranteed an employee four years of employment. 820 F.Supp. at 254–55. As a result of this promise, the employee sold his home, moved his family, terminated negotiations on the purchase of a business, and closed his current consulting business. *Id.* at 255. The court evaluated

the modern rule of equitable estoppel, and determined that the employer was estopped from asserting the statute of frauds defense. *Id.* at 257.

The Fourth Circuit has interpreted the Virginia modern doctrine of equitable estoppel as stated in *T. v. T.* in two different lines of reasoning. *Nargi,* 820 F.Supp. at 257 n. 3 (referencing *Barry v. Donnelly,* 781 F.2d 1040 (4th Cir.1986) and *Lance J. Marchiafava, Inc. v. Haft,* 777 F.2d 942 (4th Cir.1985)). In 1985, the Fourth Circuit held that, "[i]t is well established ... that the doctrine of equitable estoppel does not apply to situations in which the party asserting the estoppel has suffered detriment resulting solely from another party's failure to perform an obligation under the oral agreement." *Marchiafava,* 777 F.2d at 945. The court in *Marchiafava* distinguished between asserting estoppel for a future promise from that of a promise about a present or existing fact. *Id.* at 946. The court determined that no claim of false intentions existed and barred the equitable estoppel defense because the plaintiff's detriment "resulted solely from [the Defendants'] failure to perform on an oral promise." *Id. Marchiafava* does not cite to the modern cases on equitable estoppel nor does it mention that fraud is not required to establish equitable estoppel. *Nargi,* 820 F.Supp. at 257 n. 3. In contrast, however, just one year later, the Fourth Circuit in *Barry v. Donnelly* explicitly held that "deceit is not an essential element of estoppel" in Virginia. 781 F.2d at 1042. No finding of fraud is required because a party "cannot justly or equitably lull his adversary into a false sense of security, and thereby cause his adversary to subject his claim to the [statute of frauds], and then be permitted to plead the very delay caused by his course of conduct as a defense to the action when brought." *Id.* at 1042. *Nargi* distinguishes *Barry* from

*Marchiafava,* indicating that *Barry* permits a finding of equitable estoppel even when no misrepresentation of a past or present fact exists. *Nargi,* 820 F.Supp. at 257 n. 3.

■ Mr. Albanese has not shown that WCI should be equitably estopped from asserting the statute of frauds defense under either line of analysis. Mr. Albanese asserts that WCI's MICP promise constitutes fraud because he completely performed under the agreement. However, Mr. Albanese has not sufficiently demonstrated fraud, as analyzed in the following sections of this Memorandum Order. *Marchiafava* also stands for the proposition that: "[t]he doctrine of part performance is not available in Virginia in such actions at law for damages for breach of contract to take an oral agreement out of the statute of frauds." *Marchiafava,* 777 F.2d at 946. Thus, Mr. Albanese's claims that his part performance demonstrates fraud lacks merit. Moreover, under *Marchiafava,* a future promise to pay a bonus for 2005 precludes a finding of equitable estoppel. *Marchiafava,* 777 F.2d at 946. Without a demonstration of false intentions, Mr. Albanese cannot allege equitable estoppel based solely on WCI's failure to perform an alleged contract. *Id.*

Mr. Albanese alternatively alleges that equitable estoppel prevents WCI from asserting the statute of frauds defense even if the Court does not find that WCI acted fraudulently because Mr. Albanese relied on WCI's statements to his detriment. (Pl.'s Mem. 24.) Under *Nargi* and the modern rule, Mr. Albanese must demonstrate a representation, reliance, a change of position, and detriment in order to establish equitable estoppel. *Nargi,* 820 F.Supp. at 256. While Mr. Albanese may be able to prove that a representation was made and that he relied on this representation, he cannot demonstrate that he relo-

cated based solely on the MICP promise. The equitable estoppel doctrine "is typically applied where a defendant has by words or conduct induced a plaintiff not to file within the statutory period, e.g., by settlement negotiations coupled with assurances." *Chance v. F.N. Wolf & Co.,* No. 93–2390, 1994 WL 529901, at *5, 1994 U.S.App. LEXIS 27508, at *14 (4th Cir. Sept. 30, 1994). Here, no evidence exists to show that WCI "lured" Mr. Albanese into any type of agreement upon which he changed his position based upon the MICP promise. *T. v. T.,* 224 S.E.2d at 152. This case differs from the outcome in *Nargi,* where an employer promised employment and the employee acted to his detriment. 820 F.Supp. at 254–55. The *Nargi* employee believed that he would maintain employment and a sufficient salary for many years. *Id.* Here, Mr. Albanese only knew that he may receive a bonus based upon the MICP program requirements. Mr. Albanese's level of reliance does not rise to the same level as the employee's reliance in *Nargi.*

The Court therefore grants Defendants' Motion for Summary Judgment on Count I as it relates to the MICP promise because it is barred by the statute of frauds and equitable estoppel does not apply.

## B. Mr. Albanese's additional arguments

The Court grants Defendants' Motion for Summary Judgment on Count I as it relates to the MICP promise because the statute of frauds bars finding an enforceable contract. Mr. Albanese asserts two alternative arguments in support of his allegation that the statute of frauds does not apply to this promise: first, he alleges that Mr. Hanlon's January, 2005 email about Mr. Albanese's increase in base salary eligibility renewed the contract and second, he asserts that he completely per-

formed his obligations under the contract within a year of January 2005 regardless of whether WCI could perform their part of the agreement.

Both of Mr. Albanese's contentions fail. First, Mr. Hanlon's January, 2005 email did not restart the time clock with regard to calculating the statute of frauds. Mr. Albanese relies on *Knox Stove Works, Inc. v. Wall,* to argue that the time period for application of the statute of frauds begins to run from the date of a renewal of the express terms of a former contract. 180 Va. 267, 23 S.E.2d 161 (1942) (Pl.'s Mem. 21.) In *Knox,* an employee promised his supervisor that he would not seek other employment and agreed to stay with his employer through the end of 1939 despite a reduction in pay. *Knox,* 23 S.E.2d at 162. The supervisor and employee later met in January 1939 and discussed the agreement specifics, such as the employee's sales territory and the supervisor's expectations. *Id.* A new supervisor subsequently took over and terminated the employee in April 1939. *Id.* The Virginia Supreme Court found that the supervisor and employee's discussion in January constituted "more than a mere acknowledgment or restatement of the terms of the original agreement on and after the day of its commencement." *Id.* at 163. The terms were "gone over again." *Id.*

■ Here, Mr. Hanlon's email in January, 2005 informing Mr. Albanese that he was now eligible for 100% of his base salary did not create a new agreement or renew a former agreement. This situation differs from *Knox* because Mr. Hanlon's email did not reference any of the terms previously identified in the August 25, 2004 offer letter. The August 25, 2004 letter only referenced the 2004 MICP program, while the January 2005 email increased Mr. Albanese's possible eligibility in the 2005 MICP program. This email simply told Mr. Albanese that his MICP eligibility percentage had increased to 100% of his base salary; it did not promise any amount or type of bonus under the MICP program nor did it contain any further negotiations or terms like the employee and supervisor's discussion in *Knox.* This email therefore does not constitute the appropriate date from which to calculate the statute of frauds.

Second, Mr. Albanese asserts that he fully performed his part of the agreement by working for WCI throughout 2005 and, therefore, the statute of frauds does not apply. Mr. Albanese relies on *Greenbrier Farms, Inc. v. Clarke,* to assert that "an agreement does not fall within the statute if that which one of the parties is to do is all to be performed within a year." 193 Va. 891, 71 S.E.2d 167, 170 (1952) Mr. Albanese argues that he performed his duties under the contract within a year and the agreement therefore falls outside the statute of frauds. However, Mr. Albanese's allegations hinge on the Court finding that the appropriate start date for the statute of frauds began with Mr. Hanlon's email in January 2005. As stated above and pursuant to *Knox,* any agreement stemming from Mr. Hanlon's statement regarding the calculation of Mr. Albanese's 2005 MICP bonus was entered in August 2004, not in January 2005, and the terms are therefore unenforceable pursuant to the statute of frauds.

At oral argument, Mr. Albanese further alleged that the August 25, 2004, offer letter demonstrates that WCI promised Mr. Albanese a specific bonus for 2005. Mr. Albanese relied on Mr. Hanlon's statement in the offer letter that "it is noteworthy that the top end [sic] (160% of bonus) you could earn $663,000 salary and bonus under our current compensation program, compared to your current maximum compensation level of $320,000 [sic]." (Pl.'s

Ex. 3.) Mr. Albanese claims that this calculation must refer to the 2005 MICP calculation because he could not earn the $663,000.00 mentioned in the letter in 2004 under his current eligibility. However, as WCI pointed out, under Mr. Albanese's 2005 salary structure, Mr. Albanese would have been eligible for more than the $663,000.00 figure. Mr. Albanese therefore cannot rely on this figure to prove that the August 25, 2004, offer letter promised Mr. Albanese a MICP bonus in 2005. Further, the very next sentence in the August 25, 2004, offer letter makes reference to 2004, not 2005: "It is important to note that your 2004 MICP will be prorated." (Pl.'s Ex. 3.) No evidence therefore exists in the August 25, 2005, offer letter to show that WCI promised Mr. Albanese a specific MICP bonus in 2005. The Court grants Defendants' Motion for Summary Judgment on Count I as it relates to the MICP promise because the statute of frauds bars finding an enforceable contract.

## C. Conclusion

The Court grants Defendants' Motion for Summary Judgment as a matter of law on Count I as it relates to the MICP promise because no valid contract exists and equitable estoppel does not apply. The MICP promise falls within the statute of frauds. No enforceable contract exists because the parties did not commit the terms to writing.

## 3. Relocation Expenses promise

The Court denies Defendants' Motion for Summary Judgment as it relates to the Relocation Expenses promise because a material fact exists as to what the parties intended by "reasonable closing costs." A court should construe a written contract when the agreement is clear and unambiguous on its face. *Greater Richmond Civic Recreation, Inc. v. A.H. Ewing's Sons, Inc.,* 200 Va. 593, 106 S.E.2d 595, 597 (1959). When the language in the agreement contains ambiguities and reasonable minds may differ about the meaning of the term, the jury can consider parol evidence to construe the proper intentions of the parties. *Id.; Vega v. Chattan Assocs.,* 246 Va. 196, 435 S.E.2d 142, 145 (1993).

Mr. Albanese alleges that WCI breached their contract because they failed to reimburse Mr. Albanese for the reasonable closing costs he incurred in relocating to the Washington, D.C. area. The August 25, 2004, offer letter specifically indicated that WCI would reimburse Mr. Albanese for "reasonable closing costs related to both the sale and purchase of [primary] residence." (Pl.'s Ex. 5.) Mr. Albanese requests that WCI reimburse him for "certain closing costs that were paid for by the seller at closing." (Pl.'s Mem. 12.) Mr. Albanese asserts that WCI intended to pay for the closing costs and gross ups in conjunction with the purchase of a home in the Washington, D.C. area. (Pl.'s Mem. 25.) He relies on an email from Marcienne Tiebout–Touron, Senior Financial Manager of the Tower Division, sent to Mr. Albanese on November 30, 2004, detailing her interpretation of the amount of closing costs for Mr. Albanese's purchase of a $1.6 million home. (Pl.'s Ex. 19; Pl.'s Mem. 12.) Mr. Albanese alleges that this email demonstrates that WCI agreed to pay all closing costs associated with the sale.

WCI relies on Mr. Hanlon's testimony that he intended the "reasonable closing costs" provision to "assist [Mr. Albanese] with [his] personal relocation process" and cover Mr. Albanese's "out of pocket expenses related to his move." (Pl.'s Ex. 5; Def.'s Reply Mem. 14.) WCI also alleges that they never intended to reimburse Mr. Albanese for the seller's

commission because they had never reimbursed another employee for similar expenses. *Id.* WCI argues that the Court should rely on parol evidence to determine the parties' true intentions. *Id.* A material fact therefore exists relating to the meaning of the term "reasonable" included in the August 25, 2004, offer letter because Mr. Albanese and WCI disagree on what expenses are owed to Mr. Albanese. The tax gross ups and interest payments also relate to the ultimate interpretation of this term. (*See* Def.'s Reply Mem. 15.) The Court therefore denies WCI's Motion for Summary Judgment on the Relocation Expenses promise because a material fact exists for the fact-finder to interpret as to the term "reasonable closing costs."

### Count II—Actual Fraud and Fraud in the Inducement

■■■ The Court grants Defendants' Motion for Summary Judgment on Count II as it relates to both actual fraud and fraud in the inducement because the Second Continued Employment promise refers to future actions and Mr. Albanese has not provided sufficient support for a conclusion that Mr. Hanlon knew these representations were false at the time they were made. To establish a cause of action for actual fraud in Virginia, a plaintiff must prove, by clear and convincing evidence: (1) a false representation; (2) of a material fact; (3) made intentionally and knowingly; (4) with intent to mislead; (5) reliance by the party misled; and (6) resulting damage to the party misled. *Cohn v. Knowledge Connections, Inc.*, 266 Va. 362, 585 S.E.2d 578, 581 (2003). Traditionally, a fraud claim must be based on the misrepresentation of a present *or pre-existing fact. Patrick v. Summers*, 235 Va. 452, 369 S.E.2d 162, 164 (1988); *Lloyd v. Smith*, 150 Va. 132, 142 S.E. 363, 365 (1928). A claimant cannot base a claim on unfulfilled promises or statements about future events. *Patrick*, 369 S.E.2d at 164; *Lloyd*, 142 S.E. at 365. However, when a promisor makes a promise intending not to perform, this promise constitutes a misrepresentation of present fact if the promisor intended that the promisee act to his detriment. *Colonial Ford Truck Sales, Inc. v. Schneider*, 228 Va. 671, 325 S.E.2d 91, 94 (1985).

■■■ A similar premise holds true for fraud in the inducement. A party will have a claim for fraudulent inducement when a misrepresentation or concealment was intended to, and in fact did, induce the formation of the contract. *Ware v. Scott*, 220 Va. 317, 257 S.E.2d 855, 857 (1979). While a party cannot falsely represent a material fact that serves as an inducement to the contract, on which another party has a right to rely, the fraud also cannot be "predicated on unfulfilled promises or statements of future events." *Compare Augusta Mut. Ins. Co. v. Mason*, 645 S.E.2d 290, 293 (Va.2007)(evaluating whether Defendants misrepresented the condition of an airplane during a sale, while ultimately finding that the plaintiff's claims arose in contract, not in tort) and *Poth v. Russey*, 281 F.Supp.2d 814, 825 (E.D.Va.2003) (citing *Patrick*, 369 S.E.2d at 164) (holding that a promise in a merger agreement setting an initial public offering price constituted an unactionable future event).

■■■ Virginia "distinguishes between a statement that is false when made and a promise that becomes false only when the promisor later fails to keep his word. The former is fraud, the latter is breach of contract." *Lissmann v. Hartford Fire Ins. Co.*, 848 F.2d 50, 53 (4th Cir.1988) (citing *Colonial Ford Truck Sales*, 228 Va. 671, 325 S.E.2d 91). "A promise to perform an act in the future is not, in a legal sense, a representation as that term is

used in the fraud context." *Lissmann*, 848 F.2d at 53.

 Mr. Albanese alleges that WCI committed actual fraud and fraud in the inducement when, after the acquisition of Renaissance Housing, Mr. Hanlon told Mr. Albanese that he could return to Florida if WCI discontinued pursuing Mid–Atlantic business. (Am. Compl. ¶ 64.) This Second Continued Employment promise is a reference to potential action in the future. Under Virginia law, a promise to perform in the future cannot constitute actual fraud or fraud in the inducement.

The Second Continued Employment promise therefore does not constitute a false representation, an element required to prove fraud in Virginia. Mr. Hanlon told Mr. Albanese that Mr. Albanese could return to Florida if WCI decided not to continue tower operations in the Mid–Atlantic region. WCI, however, maintained operations in this region throughout Mr. Albanese's term of employment—in fact, WCI continues to pursue operations in this region. (Def.'s Mem. 5; Def.'s Ex. C.) No evidence exists to show that Mr. Hanlon's representation to Mr. Albanese was false. Moreover, the statement concerns an action that could only happen in the future. Mr. Albanese did not establish that the Second Continued Employment promise constitutes a false representation.

Mr. Albanese further alleges that an exception applies to this claim because Mr. Hanlon intended to induce Mr. Albanese to remain in the Mid–Atlantic region to his detriment. Mr. Albanese relies on Mr. Hanlon's failure to tell Mr. Starkey about his statements regarding the possibility of pursuing comparable employment in Florida to Mr. Albanese and Mr. Starkey's testimony that WCI had decided not to pursue further tower operations in 2005 to show WCI's intentions. (Pl.'s Mem. 29–30.) Mr. Albanese claims that he re-mained in the Mid–Atlantic region working for Mr. Small under the impression that he could relocate to Florida if "things did not work out." (*See* Albanese Dep. 104:1–2.) However, Mr. Albanese's allegations do not show that WCI deliberately sought to keep Mr. Albanese in the Mid–Atlantic region by telling him that he could move back to Florida. While WCI may have halted its acquisition strategy in the Washington, D.C. area in mid–2005 (*see* Starkey Dep. 30:4–11), this does not prove that Mr. Hanlon never intended to find Mr. Albanese comparable employment in Florida should WCI choose to permanently discontinue any operations in the Mid–Atlantic region. The Court therefore grants Defendants' Motion for Summary Judgment as to Count II as it relates to both actual fraud and fraud in the inducement because the Second Continued Employment promise referred to future actions and did not constitute a false representation.

### Count III—Constructive Fraud

 The Court grants Defendants' Motion for Summary Judgment on Count III as it relates to constructive fraud because all of the promises at issue—the First and Second Continued Employment promises, the MICP promise, and the Relocation Expenses promise—relate to future events or unfulfilled promises. To establish a claim of constructive fraud, a plaintiff must show, by clear and convincing evidence, "that a false representation of a material fact was made innocently or negligently, and the injured party was damaged as a result of his reliance upon the misrepresentation." *Prospect Dev. Co. v. Bershader*, 258 Va. 75, 515 S.E.2d 291, 297 (1999). "Additionally, fraud must relate to a present or a pre-existing fact, and cannot ordinarily be predicated on unfulfilled promises or statements as to future events." *Id.* The plaintiff bears the burden to prove "that one has represented as

true what is really false" in such a way that induces a reasonable person to believe the statement. *State Farm Mut. Auto. Ins. Co. v. Remley,* 270 Va. 209, 618 S.E.2d 316, 321 (2005); *Eden v. Weight,* 265 Va. 398, 578 S.E.2d 769, 774 (2003).

■ Mr. Albanese claims that WCI committed constructive fraud when they made the First and Second Continued Employment promises, the MICP promise, and the Relocation Expenses promise (collectively, hereinafter "WCI Promises") because "[a]t the time these representations were made, WCI did not intend to do [any of the WCI Promises]." (Pl.'s Mem. 28.) None of these alleged promises constitute constructive fraud because they all relate to unfulfilled promises or future events. The First and Second Continued Employment promise indicated that Mr. Albanese could potentially change the location of his employment at an undetermined point in the future. Similarly, the MICP promise, which includes Mr. Hanlon's statements about the 2005 bonus structure and his January 2005 email to Mr. Albanese, referenced Mr. Albanese's eligibility, not right, to receive a bonus in 2005. Further, the Relocation Expenses promise involves a future event because Mr. Albanese had not yet begun the relocation process at the time the August 25, 2004, offer letter included this promise. Because all of the WCI Promises are dependent upon future events, they cannot predicate a constructive fraud claim. *See Jefferson v. Briner, Inc.,* No. 3:05–cv–652, 2006 WL 1720692, at *11, 2006 U.S. Dist. LEXIS 41423, at *34–35 (E.D. Va. June 21, 2006) (utilizing an actual fraud analysis to determine that constructive fraud does not exist when an agreement is dependent upon the occurrence of other events first); *McMillion v. Dryvit Sys.,* 262 Va. 463, 552 S.E.2d 364, 369 (2001) (constructive fraud does not exist because representations about how a company would perform in the future if plaintiff utilized it in constructing a home constitute opinion statements). The WCI Promises all refer to promises that may be fulfilled in the future, but do not involve a current or existing fact.

Moreover, Mr. Albanese has not demonstrated the existence of a material issue of fact regarding whether any of the three statements were false at the time that they were made to Mr. Albanese. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. No material issues of fact exist regarding the First or Second Continued Employment promises as it relates to constructive fraud. Even if Mr. Hanlon told Mr. Albanese that his 2005 bonus would be based on the entire tower division, no disputed material fact exists about whether Mr. Hanlon knew this to be false at the time he communicated the bonus structure to Mr. Albanese. Mr. Albanese alleges that WCI never intended to award a bonus based on tower division success as evidenced by Mr. Hanlon's indication that he would speak with Mr. Starkey about the bonus, his failure to do so, and Mr. Hanlon's concurrence with WCI management to use discretion in calculating Mr. Albanese's bonus. (Pl.'s Mem. 28–29.) WCI does not dispute these facts. (Def.'s Reply Mem. 3.) WCI *does* dispute whether Mr. Hanlon told Mr. Albanese that the 2005 bonus would be based on the entire tower division. *Id.* Even though these discrepancies in the facts exist, they need not be resolved because the constructive fraud claim fails as a matter of law. *Id.* Moreover, the email that Mr. Hanlon sent informing Mr. Albanese that he now qualified for a 100% target base salary for the MICP program only referenced Mr. Albanese's bonus potential, not how the bonus would be structured.

Mr. Albanese also has not shown that WCI falsely represented that it would reimburse him for "reasonable closing costs" and that it would "gross up" these expenses. In fact, WCI did reimburse Mr. Albanese for a. large amount of expenses associated with his relocation to the Washington, D.C. area. WCI has already reimbursed Mr. Albanese in the amount of $207,400.26, including tax gross ups where applicable. (Def.'s Mem. 17; Def.'s Ex. D.)

Even if Mr. Albanese relied on the WCI Promises and acted to his detriment, he has not shown that a material issue of fact exists that would alter the outcome under the law. The Court therefore grants Defendants' Motion for Summary Judgment on Count III as it relates to constructive fraud because the WCI Promises each constitute a reference to an unfulfilled promise or future event and Mr. Albanese has not shown that the statements were false.

### III. Conclusion

For the foregoing reasons, the Court grants Defendants' Motion for Summary Judgment for part of Count I (breach of contract), and all of Counts II (actual fraud and fraud in the inducement) and III (constructive fraud). The Court grants Defendants' Motion for Summary Judgment on Count I (breach of contract) as it relates to the First and Second Continued Employment promises because Mr. Albanese served as an employee at-will and no valid contract exists due to indefinite terms and as it relates to the MICP promise because it does not constitute a valid contract under the statute of frauds. The Court denies Defendants' Motion for Summary Judgment on Count I (breach of contract) as it relates to the Relocation Expenses promise because a material issue of fact exists with regards to the parties' interpretation of WCI's agreement to reimbursement Mr. Albanese's reasonable closing

costs. The Court further grants Defendants' Motion for Summary Judgment on Count II (actual fraud and fraud in the inducement) because the Second Continued Employment promise referred to future action and on Count III (constructive fraud) because all WCI Promises constitute either future actions or unfulfilled promises and Mr. Albanese did not show that Mr. Hanlon knew the statements were false when he iterated each statement to Mr. Albanese. For the forgoing reasons, it is hereby

ORDERED that Defendants' Motion for Summary Judgment is GRANTED in part and DENIED in part.

The Clerk is directed to forward a copy of this Order to counsel.